(No. 57256.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY MADEJ, Appellant.

*Opinion filed April 19, 1985.—Rehearing denied May 31, 1985.*

202

204

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Michael E. Shabat, Joan S. Cherry, and Garritt E. Howard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Gregory Madej, was indicted in the circuit court of Cook County on one count for the murder of Barbara Doyle (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), and on three counts of felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)) predicated on the felonies of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1) and deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3). Following a bench trial, the defendant was found guilty on all counts. A bench sentencing hearing was held, at which the court heard evidence in mitigation and aggravation. The court sentenced the defendant to death on the one count of murder and three counts of felony murder, and also sentenced the defendant to concurrent terms of 30 years' imprisonment for armed robbery and rape. The defendant has appealed directly to this court under the Constitution of Illinois (Ill. Const. 1970, art. VI, sec. 4(b)) and under our Rule 603 (87 Ill.

2d R. 603).

The naked body of Barbara Doyle was discovered at 5:30 a.m. on August 23, 1981, in an alley on the northwest side of Chicago. The woman died as a result of multiple stab wounds. There were numerous lacerations of the head and face, and multiple abrasions of the chest, legs and feet. A medical examination revealed the presence of spermatozoa and semen in both the vagina and rectum of the victim. Human blood was found underneath her fingernails.

At trial two Chicago police officers testified that at 5 a.m. on August 23, 1981, they observed a green Plymouth Baracuda automobile with a faulty muffler drive through a stop sign. The car was driven by the defendant, and it was later ascertained that it was the victim's auto. The police attempted to pull the car over, but the defendant speeded up, leading police on a high-speed chase. Several police cars joined the chase. The defendant eventually pulled into an alley, alighted from the car, jumped a fence, and hid under an auto parked on a nearby street where he was taken into custody. There was blood on his hands and head, and his shirt, pants and undershorts were heavily stained with what was later determined to be blood of the same type as that of the victim, type O. The defendant has type AB blood. The defendant had deep scratches on his face and numerous scratches on the chest, arms and back.

Detective Robert Meyer testified that he examined the victim's auto in the alley immediately after the defendant had fled from it and observed a large pool of blood on the front floor on the passenger's side. There was a large bloodstained knife on the driver's seat. Detective Meyer testified that he discovered the victim's jeans and blouse, saturated with blood, in the back seat of the car. The blouse had numerous perforation marks in the front, and the jeans were torn in the back. An

empty prescription bottle bearing the victim's name was found in the car, together with her purse and personal identification papers scattered on the floor.

When the defendant was taken into custody, his *Miranda* rights were read to him and he was interrogated as to his activities on August 23, 1981. Detective James Grant testified that the defendant said that he was thrown out of the Garage Inn, a bar, at 2:30 a.m. and then met a friend named "Hojamoto," who was driving a green Plymouth Barracuda. The defendant entered the car to go "cruising," and he noticed that Hojamoto had a knife with blood on it and had blood on his shirt. Hojamoto explained the blood by stating that he had been in a gang fight. The defendant told Grant that he got blood on his clothes when he switched seats with Hojamoto and that Hojamoto jumped from the car a block before police overtook the defendant. The defendant denied being in the company of a woman that night and denied being in the Golden Flame restaurant. He also told the detective that he received the scratches in a fight with some gang members earlier that morning.

Prosecution witnesses testified that the defendant was ejected from the Garage Inn at 2:30 a.m. after he caused a disturbance by pounding a cigarette machine and telephone. David Doyle, the victim's estranged husband, testified that the victim and he drank at the Garage Inn until 2:15 a.m. when they left the bar and fell asleep in her auto. When he awoke, Doyle said the defendant was driving the car and talking to the victim. Doyle stated that he had never seen the defendant before, but that it appeared that Barbara knew the defendant. The defendant drove to the Golden Flame restaurant. He and Barbara entered the restaurant; at that time David Doyle walked home. A waitress at the Golden Flame testified that she served coffee to the victim and the defendant. She testified that they left the

restaurant at 3:30 a.m. Another prosecution witness testified that the term "Hojamoto" was not the name of an individual, but was a made up name used by the defendant and friends as a group greeting.

The defendant was a witness. His testimony differed from the statement he had given the police. He testified that on August 22, 1981, he awoke at 8 a.m. He began drinking alcohol and ingesting various drugs, and "partied" with friends throughout the day. He next remembered being at the Garage Inn at 11 p.m. The defendant stated that he saw Barbara Doyle at the bar with David Doyle, and that he had known the victim and had had sex with her on three prior occasions. The defendant recalled pounding on the cigarette machine and slamming the telephone. He also remembered that it was "exactly 2:20 a.m." when he was ejected from the bar.

After leaving the tavern, the defendant saw the victim's car parked nearby. He approached the car, at which time the victim saw him and asked him to smoke some marijuana. The defendant said he entered the car and they drove to the Golden Flame restaurant, had some coffee and left about 3:30 a.m. They then began "cruising" around the neighborhood. They stopped at three different places to purchase beer, while drinking and smoking marijuana. He testified that on August 22, 1981, he drank at least two cases of beer and some whiskey, smoked about one ounce of marijuana, ingested 10 quaaludes, and injected Talwin.

The defendant testified that, while driving around, the victim and he stopped twice and had consensual sexual relations in the car. Later the victim asked the defendant if she could buy some marijuana from him. He took seven one-ounce baggies of marijuana from his boots and placed them on the car console. She gave the defendant $35 for one of the baggies, and when he turned to put the money in his pocket, she apparently

took two more of the baggies. According to the defendant, he pushed the victim's shoulder when he saw a baggie underneath her leg. The victim then attacked him, scratching his face and drawing a knife. They struggled, and the defendant next remembered the victim bleeding in the chest area and spread between the car seats. The defendant testified that he first saw the victim bleeding "after I realized what had happened" and in response to the question as to what caused the victim to bleed stated, "I thought it could have been me."

The defendant said that he thought the victim was "still wiggling" and "for some odd reason, I thought to myself of throwing—laying her down" on the ground. He put the victim outside the car and while driving from the alley, the autoptic and photographic evidence showed, he ran the car over her. The defendant testified that as he drove away he honked his horn to get attention and summon help for the victim. He then drove to a friend's house to get help. His friend did not answer the door and he drove away. The defendant then described in detail the route he took before the police apprehended him. He testified that he did not remember the police chasing him and remembered only that he was afraid because he was driving without a license. The defendant also testified that the reason he told the police the story about "Hojamoto" at the police station was because the police had beaten him.

The defendant was convicted on all counts. Later he waived a jury for the hearing to determine whether the death penalty should be imposed. All of the evidence presented at trial was made part of the sentencing hearing by stipulation, and the defendant testified on his own behalf in mitigation. The court found the existence of statutory aggravating factors and determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence. Ill. Rev. Stat. 1979, ch.

38, pars. 9—1(b), (c).

The defendant makes a number of contentions that the death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) is unconstitutional. The contentions have been previously rejected by this court, and the defendant gives no new reasons for us to reconsider those holdings. We have held that the death penalty statute is not unconstitutional for granting prosecutors discretion in seeking the death penalty. (*People v. Owens* (1984), 102 Ill. 2d 88, 114; *People v. Davis* (1983), 95 Ill. 2d 1, 22; *People v. Szabo* (1983), 94 Ill. 2d 327, 351.) Nor is the statute unconstitutional because it does not require the State to prove beyond reasonable doubt the absence of mitigating factors sufficient to preclude the imposition of the death penalty. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-81.) This court has also rejected the contention that the sentencing scheme of the statute fails to provide for adequate comparative review of capital cases (*People v. Silagy* (1984), 101 Ill. 2d 147, 161; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; see also *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and we have judged that the consideration, during the sentencing phase, of nonstatutory aggravating factors does not render the statute invalid (*People v. Gacy* (1984), 103 Ill. 2d 1, 104; *People v. Caballero* (1984), 102 Ill. 2d 23, 49; *People v. Free* (1983), 94 Ill. 2d 378, 427).

The defendant maintains that the death penalty statute is unconstitutional in that it fails to require a presentence investigation report for judge-conducted death penalty hearings. He argues that, because of this statutory omission, the trial court conducted the death penalty hearing without the benefit of information which would have been included in the presentence report. Therefore, his sentences should be vacated and the cause remanded for resentencing. The defendant recognizes that in *Peo-*

*ple v. Gaines* (1981), 88 Ill. 2d 342, 372-74, this court held that a presentence investigation report is not required in capital murder cases, but argues that *Gaines* involved sentencing by a jury, and, here, the sentencing was by a judge. The defendant does not, however, advance convincing reasons why a presentence report should be required for a judge though not for a jury. Here, of course, the sentencing judge presided at the guilt and sentencing phases and heard all the evidence regarding the defendant's background and social history, as well as his physical and mental condition. Contrary to defendant's claim, there was sufficient evidence, including testimony from the defendant during the sentencing hearing, to inform the judge and substantially fulfill the purpose of a presentence investigation report (Ill. Rev. Stat. 1981, ch. 38, par. 1005—3—2(a)). We also note that defects in a presentence investigation report may be waived, and defendant, here, did not object to the court imposing sentence without a presentence report. See *People v. Gacy* (1984), 103 Ill. 2d 1, 107.

The defendant contends also that the death penalty statute is unconstitutional because it arbitrarily, the defendant says, limits the application of the death sentence to English-speaking defendants, while prohibiting the imposition of the death penalty on defendants who require translators or other assistance to be fit for trial. He says that this is the effect of sections 104—22 and 104—26(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b)). This contention, however, is error, based on a serious misunderstanding of the statutory structure involved. We made this clear in *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502, where we rejected the argument the defendant makes.

The defendant also argues that his convictions be reversed and his death sentence vacated because the pros-

ecutor, in closing argument, falsely represented to the court that the police did not inventory any marijuana. Throughout the trial the defendant argued that he consumed a number of drugs, including marijuana, and was in such a drugged state that he could not form the intent for murder. A police inventory form in the record indicates that one "bag containing crushed green plant" was taken from the defendant at the police station. At trial, the bag was never referred to by either party, although the detective who prepared the inventory was questioned at trial about a number of the other items listed in the inventory.

During closing argument, the defendant's attorney commented on a prescription pill bottle bearing the victim's name that was found in the car, but was misplaced by the police and not listed on the inventory. Counsel then went on to say:

> "What else is not taken into custody by the police or at least not recorded by the police? The other drug evidence, the pot. We know that pot is commonly used in society and this marijuana somehow disappeared between the time of the stop and the inventory at the 17th District.
>
> So, not only does the pill bottle disappear, but we have the pot and one bag of marijuana and the quaaludes. So, we have questions as to what was or was not found."

In response to this argument, the prosecutor stated in his rebuttal argument:

> "Where is the marijuana? The police now are taking the marijuana and hiding it. No possible way, Judge. The marijuana would have been something the police would have wanted to inventory, in fact, because at the time the police recovered these items, they would have not known the significance of it. The police took this and used it for their own personal use? No possible way."

The defendant argues that this statement by the prosecutor denied him a fair trial because the prosecutor mis-

led the court by suggesting there was no marijuana inventoried by the police.

The bag was never referred to at trial, and there was no evidence that it contained marijuana. The defendant erred in referring to it as evidence. The prosecutor's statement appears to have been a sarcastic response to defense counsel's statement that the bag had "somehow disappeared" after it was taken from the defendant. We do not find any error of importance in the State's comments.

In a related argument, the defendant claims that his attorney's failure to mention the bag of crushed green plant to support defendant's drug intoxication defense was proof of his ineffective assistance. The defendant states that, if his attorney had introduced the evidence, it would have made his testimony more believable.

It appears, however, that the introduction of the bag, even if it were shown to have been marijuana, would have impugned the defendant's credibility. He testified in detail that he had seven one-ounce bags of marijuana tucked in his boots, one of which he sold to the victim. He testified that he fought with the victim and stabbed her because she had stolen two bags when he turned away from her in the car. Introduction of only one bag would have been inconsistent with the defendant's testimony at trial and defense counsel's presumed strategy of presenting defendant as a believable witness. A claim of incompetency which arises from a matter of defense strategy will not, of course, support a claim of ineffective representation. *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44.

The defendant also claims a denial of assistance of counsel, due to other conduct of his attorney at trial and the sentencing hearing. The defendant urges that we replace the standard described in *People v. Greer* (1980), 79 Ill. 2d 103, 120-21, with the standard set out in

*United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, 641 (trial counsel must satisfy minimum professional standards of competent representation).

In *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, we rejected the single-component test of *Twomey* and followed the two-part standard announced by the Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which closely resembles the standard of *Greer*. In *Strickland*, the court held that to establish a denial of effective assistance of counsel the defendant must prove (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064-65.) The court stated that there was "no particular set of detailed rules" with which to judge counsel's conduct, but that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. 668, 688-89, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.

The defendant argues, too, that his counsel's assistance was ineffective because he failed to present sufficient mitigating evidence during the sentencing hearing and failed to pursue an involuntary-intoxication defense. The defendant contends that otherwise the court "may have reached a different conclusion" as to the defendant's guilt and death sentence.

The court, however, in *Strickland* made it clear that "[i]t is not enough for the defendant to show that the errors [of counsel] had some conceivable effect on the outcome of the proceeding." (466 U.S. 668, 693, 80 L. Ed.

2d 674, 697, 104 S. Ct. 2052, 2067.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) In determining whether there has been ineffective representation a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70.) Even if, *arguendo*, counsel did make those errors, when the overwhelming evidence supporting the verdict is considered, the defendant clearly has failed to meet the burden of demonstrating a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

The defendant also argues that his defense of drug and alcohol intoxication was improperly rejected by the trial court. He claims that there was evidence that he was in a drugged and intoxicated condition, *i.e.*, evidence of the large quantity of alcohol he consumed and various drugs he ingested throughout the day and the testimony of two witnesses who testified that they saw the defendant at the Garage Inn before the crime acting argumentatively and "very hyper."

We would first observe that the defendant's drinking and drug ingestion were voluntary. Voluntary alcohol or drug intoxication is no defense to criminal conduct unless the intoxication is so extreme as to make impossible the existence of a mental state which is an element of the crime. (Ill. Rev. Stat. 1981, ch. 38, par. 6—3; *People v. Walcher* (1969), 42 Ill. 2d 159, 163.) The record shows that the defendant testified in detail as to the events immediately before and after the murder, including the exact time he left the bar. He gave detailed descriptions of

the places to which he drove and routes that he took with the victim to purchase beer. He recounted detailed conversations he had with the victim before the stabbing. The defendant was able to drive the victim's automobile after the murder, lead police on a high-speed chase through Chicago streets and, after abandoning the car, was able to flee on foot, jump a fence, and hide under a parked car. At the police station, without hesitation, he fabricated an exculpatory story as to his whereabouts.

The trial court did not err in not accepting the defendant's intoxication defense. The defendant's own testimony and conduct dispel any notion that he was not able to act knowingly. See *People v. Gonzales* (1968), 40 Ill. 2d 233.

The defendant next contends that murder in the course of the felonies of armed robbery and rape was not proved. Armed robbery is the taking of property from the person or presence of another by the use of force or by threatening the imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1981, ch. 38, par. 18—2.) There was no question here that property, the purse and its contents and the auto itself (see *People v. Rakas* (1977), 46 Ill. App. 3d 569, 571), was taken from the victim while the defendant was armed with a dangerous weapon, the knife. The defendant claims, however, that the force used against the victim was unrelated to the taking of her property but instead was motivated by the dispute over the marijuana or to compel sexual relations. The taking of the property, armed robbery, was only incidental, he says. We consider that the court properly found that there was the felonious taking. That the robbery may have occurred before or after the marijuana and sexual-relations incidents does not insulate the defendant from the charge and crime of armed robbery.

The defendant also argues that the evidence could be interpreted to suggest that the sexual relations may have been consensual and that the violence against the victim occurred later. The argument is unimpressive. The evidence was that the victim's blouse had numerous slit marks, indicating that she was stabbed while clothed. However, her body was naked when discovered, indicating that the defendant first stabbed the victim and then removed her clothes to rape her. Too, the defendant had numerous scratch marks on his face and chest, and the victim had human blood under her fingernails. This supports the prosecution's theory that the victim struggled and fought the defendant until he stabbed her, tore off her clothes, raped her, and threw her naked body from the car.

The defendant argues that the evidence raised other possible explanations as to the slit marks in the victim's blouse, the scratches on the defendant, and why the victim was found naked. An argument, for example, is the strange contention that the victim may have been using her blouse as a shield, so to speak, while attempting to defend herself against rape. As the State notes, however, the State's burden of proof at trial is to prove guilt beyond a reasonable doubt, not beyond any possibility of a doubt. As this court observed in *People v. Rhodes* (1981), 85 Ill. 2d 241, "[T]he trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (85 Ill. 2d 241, 249.) The autoptic evidence here was sufficient to show the crime of rape and deviate sexual assault. The trial court rejected the defendant's testimony and found the evidence of defendant's guilt "absolutely overwhelming."

The defendant contends that his sentence should be vacated because he did not knowingly and intelligently waive his right to a jury for his sentencing hearing.

The record does show that the defendant signed a typewritten jury waiver form, with a handwritten notation on it that the jury waiver applied to the defendant's death penalty sentencing hearing. Also, the defendant had signed a similar form a week earlier in waiving a jury for the trial phase. We consider, too, the painstaking, careful admonition of the trial court:

"THE COURT: Now the issue of the Jury [was raised] yesterday, Defense Counsel and the Defendant indicated to me that it was the Defendant's request to have the issues determined by the Court in form of the bench sentencing. Mr. Igo, is that still the Defendant's request?

MR. IGO [Defendant's attorney]: Yes, it is, and I would like to ask Gregory, is this your signature?

DEFENDANT: Yes.

MR. IGO: And your desire to have Judge Bentivega determine your sentence?

DEFENDANT: Yes sir, it is correct.

MR. IGO: And you understand you do have a right to a Jury, is that correct?

DEFENDANT: Yes, I do.

MR. IGO: And you wish to persist in your request to have this Honorable Court to determine the sentence, is that correct?

DEFENDANT: Yes, it is.

MR. IGO: Tendering the Jury waiver, your Honor, bearing the signature of Gregory A. Madej.

THE COURT: I know it has been your attorney's representation throughout the trial, that it is your desire to have the Court determine the issue of your guilt or innocence of the charges and then conduct a separate hearing to determine the issue as it related to the death penalty. Now I know you have maintained that position at least a week or two before this Court, and I gave you overnight to meet with your attorney yesterday afternoon and this morning, of course, to see if there is any change in your position. Do you understand that? That is the reason why I gave that continuance from yesterday?

DEFENDANT: Yes, sir.

THE COURT: *** Now under the Illinois law this is a bifurcated trial situation which means it is a separate hearing and you have a new right that you didn't waive previously when you wish to be tried in the form of a bench trial, now you have a right to have a jury determine the issues on the death penalty. Do you understand all that?

DEFENDANT: Yes.

THE COURT: And, of course, your attorney would have twenty challenges since it is a capital case to determine any specific Jurors that were selected by you or your attorney, do you understand that?

DEFENDANT: Yes, sir.

\* \* \*

THE COURT: Is it your desire to go forward in the form of a bench trial?

DEFENDANT: Yes.

THE COURT: You have questions of the Court concerning procedure?

DEFENDANT: No questions at this time, your Honor.

THE COURT: All right, gentlemen, the Jury waiver defense counsel had the last two days [to consider] will be received and filed with the Clerk and finding by the Court. Both defense counsel and Judge have inquired of the Defendant. I believe that the Defendant clearly understands the decision he is making at this time."

Referring to this colloquy the defendant complains that the trial court failed to inform him that if a jury makes the sentencing determination, its decision to impose a death sentence must be unanimous, and that a divided jury vote would prevent the imposition of the death penalty.

This issue was recently addressed in *People v. Albanese* (1984), 104 Ill. 2d 504. We declined there to adopt a requirement that trial courts must inform a defendant of the jury unanimity requirement before accepting jury waivers at capital sentencing hearings. We stated in *Al-*

*banese* that there is no precise catechism required under the sixth amendment to determine whether a jury waiver has been knowingly and intelligently made and each case will be decided on its own facts. 104 Ill. 2d 504, 535-36.

It is clear from the above colloquy and the written waivers that the defendant intelligently and voluntarily waived his right to have a jury determine his sentence. The defendant discussed with his attorney the question of having the court or a jury consider the matter of sentence, and acknowledged that he understood he was deciding to waive a jury and have sentence imposed by the trial court. Also, the trial judge fully advised the defendant of the right concerned, and again the defendant stated his wish to have the court sentence him.

The defendant challenges his sentence, saying that the trial court abused discretion by failing to find, as a mitigating factor, that the defendant had no significant history of prior criminal activity. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(1).) The record showed that the defendant had four criminal convictions: one for robbery, one for auto theft, and two for criminal trespass to property. Evidence of the convictions was introduced into evidence at trial and at the sentencing hearing. We cannot say that the trial court erred in finding a "significant history of prior criminal activity" and, finding no abuse of discretion here, we decline to reverse the imposition of the death sentence.

The defendant contends, too, that the court abused discretion in not finding that the statutory mitigating factor of "extreme mental or emotional disturbance" was present. The defendant notes that there was testimony which indicated that the defendant, on the night of the crimes, was "very hyper" or "like a maniac."

It is appropriate to observe that the record shows that the court ordered a psychiatric examination for the

defendant. The psychiatrist reported:

"Based on the above examination, it is my opinion that this defendant is mentally fit for trial. He is able to understand the nature of the charges pending against him, able to understand the proceedings being taken against him, and able to cooperate with counsel in his own defense. Based on the above examination, it is my opinion that at the time of the alleged offense, this defendant was legally sane. It is my opinion he was able to appreciate the criminality of the alleged offense and was able to conform his conduct to the requirements of the law."

The record discloses further that the trial judge, during trial and at the sentencing hearing, heard and reviewed all of the evidence for and against the findings of guilt and the imposition of the death penalty. The court observed that it judged that the defendant was not functioning under extreme mental or emotional disturbance. The court stated that the defendant's claim regarding alcohol and drug consumption and intoxication contradicted the evidence of his criminal and other activities. His testimony was rejected as exaggerated and untruthful.

In a related argument, the defendant claims that even if his disturbance was less than extreme the trial court should have considered it, as the death penalty statute requires the sentencing body to consider "any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c).) However, as the State points out, the sentencing judge here stated that he did consider all mitigating factors, including the testimony of the defendant that he was under the influence of drugs and alcohol, which the defendant now cites as evidence of his less than extreme mental and emotional disturbance. Again, it is clear that the court considered, but rejected, this testimony as evidence of a mitigating factor.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk is directed to enter an order setting Wednesday, the 13th day of November, 1985, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed. The defendant shall be executed by a lethal injection, in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of the Department of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the defendant's convictions should be affirmed, but for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I dissent from the decision to impose the death penalty.