THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff- Appellee, v. RAPHAEL HERMOSILLO *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—92—1449, 1—92—1450 cons.

Opinion filed November 19, 1993.

Anthony Pinelli, of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan R. Schierl, and Leslie German, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Defendants, Ralph Hermosillo and Ruben Zamora, were charged with aggravated criminal sexual assault, criminal sexual assault and unlawful restraint. After a bench trial, defendants were found guilty of criminal sexual assault and unlawful restraint, but not guilty of aggravated criminal sexual assault. The trial court sentenced defendants to a term of six years for criminal sexual assault and to a concurrent one-year term for unlawful restraint. Defendants appeal, contending that: (1) the State failed to prove them guilty beyond a reasonable doubt; (2) the trial court erred in allowing the State to introduce prejudicial hearsay evidence and in precluding them from introducing relevant evidence to support their theory of consent; and (3) they were deprived of effective assistance of counsel.

The relevant facts are as follows. On April 22, 1990, the victim, Annette C., attended a party at Hermosillo's house located in Stickney Township. She arrived at the party at approximately 8 p.m. Annette knew Hermosillo prior to the night of the party and admitted to having sexual intercourse with him on a former occasion. Annette met Zamora for the first time at the party.

Annette testified that sometime between 11 p.m. and midnight, she went into the living room and sat down on the couch between defendants when they grabbed her arms. Annette looked up and saw another man, whose name she did not know, turn off the lights and approach her. Annette kicked the man, and he in turn punched her and pulled off her pants. Defendants turned Annette over and pushed her facedown on the couch. During this time one of her arms was released, but the other arm remained held throughout the assault. As she was in this position, Annette felt her vagina penetrated three separate times. After the third time, Annette was released and the

lights were turned on. Annette became hysterical, grabbed her pants and ran out the door. A man named "Andy" drove her to her house. Annette stated that she confused the names when she testified on direct examination that a man named "Adam" drove her home. No one else was in the car. Prior to taking her home, Andy drove to a nearby town because Annette told him she wanted to purchase a gun. Andy then drove Annette home. Annette had consumed approximately 15 beers prior to the incident.

When she arrived home, Annette was crying and embarrassed over what had happened, and was too depressed to sleep. She waited until her mother left for work and then called Helena Lesniak, a nurse's aide at St. Anthony's Hospital, where she had been a patient. Annette told Lesniak what had occurred the night before and asked Lesniak what she should do. Up to this point, Annette had told no one about the assault. Annette then called Rich Kowalski, her alcoholism sponsor, whom she had known for seven years. Annette informed Kowalski about the incident and told him that she was feeling suicidal. After Annette talked to Kowalski, she drank cough syrup and swallowed some pills. Kowalski arrived shortly thereafter and took her to the hospital, where she stayed for a few days. While at the hospital, Annette spoke with police about the incident.

Kowalski testified for the State that on the afternoon of April 23, he received a telephone call from Annette, who told him that she had been "gang raped" the night before. Kowalski asked Annette what she was talking about, and she responded, "Well, I was at these people's house and ... they raped me." Kowalski asked how many people were involved in the assault, and she responded that there were four or five. Annette was very emotional during the phone conversation. Approximately one hour later, Kowalski picked her up at her home and took her to the hospital.

Lesniak testified for the State that on April 23, Annette telephoned her at approximately 1 p.m. Annette was hysterical and told Lesniak that "she [didn't] know what to do." Lesniak asked Annette what had happened, and Annette replied that she was at a party the night before and some men raped her. Annette asked Lesniak what to do, and said that she felt like hurting herself. Lesniak told Annette to go to the hospital and make out a police report.

Defendants called several witnesses to testify on their behalf. Andy Fragoso testified that on the night in question, sometime between 9 or 10 p.m., he and Annette went to a liquor store to purchase beer. On the way back from the store, Annette attempted to perform oral sex with him. Afterwards, they returned to the party, where at

some point Fragoso fell asleep on a living room couch. When he awoke, he observed four or five men standing around the couch where Annette was sitting. Annette was naked and was engaged in sexual intercourse with a man, whose name Fragoso did not know. Defendants were standing around watching. No one was holding Annette's arms, and Annette was not fighting back.

After Annette and the unnamed man were finished having sex, a man by the name of Jeff began to have intercourse with Annette, followed by Zamora. Fragoso then attempted to have intercourse with Annette, but she told him to get off of her because he was too heavy. Zamora told Annette to "get on all fours," and she performed oral sex with Fragoso while having intercourse again with Zamora. Hermosillo then attempted to have intercourse with her, followed by another individual. At no time did Annette tell the men to stop or attempt to leave the room.

When the sexual activity ceased, Annette sat up on the couch, smoked a cigarette and drank a beer. The men then told her to leave and told Fragoso to give her a ride home. Fragoso also dropped Zamora off and then took Annette home. During the ride, Annette told Fragoso that in her mind she had been raped at the party. Annette told Fragoso that she wanted to get a gun and kill all of them, and said she was going to get a gang to go after them.

Fragoso was interviewed by the police on May 1, 3, and 6, 1990. During the May 1 interview, Fragoso told Detective Patrick Foley that he saw "Jeff" and then defendants have intercourse with Annette. At trial, Fragoso denied telling Foley that Annette was hysterical throughout the entire incident, and that he drove her home in an attempt to calm her down. Fragoso admitted at trial telling Foley during the May 1 interview that he could not believe what the men, including defendants, had done to Annette, and that he was afraid of what defendants might do if they knew he had talked to the police.

Fragoso spoke with Foley on May 3. Fragoso again told Foley that he saw "Jeff" having intercourse with Annette while the others stood around, but this time stated that Annette appeared to be willing and showed no resistance. Fragoso also told Foley that Annette performed oral sex with him.

At the May 6 interview with Foley, Fragoso recanted what he had told Foley on May 3 regarding his participation in the sexual activity with Annette. He denied engaging in oral sex or sexual intercourse with Annette. At trial, Fragoso denied telling Foley during this third interview that Annette was hysterical during the drive home. Instead, Fragoso testified he told Foley that when he and Annette left the party, she was quiet.

Following the May 1 interview with Foley, Fragoso was contacted by Adam Montoya, who was also present during the incident. Montoya told Fragoso that he had better not talk to the police, and that if he talked to anyone, it should be to a lawyer. Montoya wanted to meet with Fragoso to discuss the matter further, but Fragoso refused. At trial, Fragoso testified that he did not tell the police the entire truth during the interviews because he was afraid of the police and Annette.

Ricky Villanueva testified for defendants that he was also at Hermosillo's party. He observed Annette flirting with other men and saw her touch Hermosillo in the groin and on the buttocks. At about 1 a.m., Villanueva and Annette left the party in his car. During the ride, she grabbed Villanueva's groin area and engaged in oral sex with him. They subsequently returned to the party.

When they arrived back at the party, Villaneuva locked his keys in the car. After attempting to retrieve them, Villaneuva entered the house and observed Annette on the couch on her hands and knees having sexual intercourse with Zamora and oral sex with Hermosillo. Villanueva sat down and watched. Another man then had intercourse with Annette, and she appeared willing. Zamora had intercourse with Annette a second time as she performed oral sex with Fragoso. No one was holding Annette down. Villaneuva attempted to engage in sexual intercourse with her, but did not. After the sexual activity ceased, Annette sat up, smoked a cigarette and asked for a ride home. When questioned by police officers three days after the incident, Villanueva denied any involvement in the incident.

Montoya testified for defendants that sometime between 10 p.m. and midnight, he followed Annette into a bedroom. She was on the telephone trying to give her aunt directions to Hermosillo's house. He began kissing Annette and touching her breasts. Montoya and Annette were in the bedroom for approximately one-half hour.

Later, Montoya helped Villanueva attempt to retrieve his keys from the car. When Montoya reentered the house at approximately 3 or 4 a.m., he saw Annette naked on the couch on her hands and knees. She and Zamora were engaged in sexual intercourse. At the same time, she was performing oral sex with Hermosillo. No one was holding Annette down. Montoya left the room and went into the bedroom. He stayed there for about half an hour watching a television show about the brain on Channel 11 at about 4 a.m. It was stipulated that Channel 11 did not broadcast between the hours of 1:15 a.m. and 6 a.m. on the dates in question.

Montoya then went out to the living room where he heard Annette laughing and telling someone to get off of her because he was

not "doing it right" and was too heavy. Montoya then saw Annette perform oral sex with Fragoso. Montoya returned to the bedroom, where he remained until he heard Hermosillo tell everyone to leave. When he came out of the bedroom, he observed Zamora sitting on the living room couch with his arm around Annette, who was smoking a cigarette and drinking a beer. Fragoso, Annette and Zamora left together.

Montoya admitted talking to Fragoso sometime after May 1 about what had occurred at the party, and suggesting to Fragoso that he talk to a lawyer before saying anything. He denied telling Fragoso not to talk to the police. Montoya acknowledged not speaking to the police on defendants' behalf about what happened at the party, even though he and defendants were friends and even after he learned that defendants had been charged with multiple felonies.

Foley testified for the State in rebuttal regarding the interviews he conducted with Fragoso. Foley recalled that at the May 1 interview Fragoso was visibly upset and afraid. Fragoso told Foley that he fell asleep on the living room couch and when he awoke at 3 a.m. he saw a man named Jeff having sexual intercourse with Annette on the couch. Other men, including defendants, were standing around with their trousers down. Fragoso stated that Annette was hysterical. When the sexual activity ended, Annette put her pants on and ran out the front door. Fragoso wanted to drive her around to calm her down because she was "very, very, upset." While in the car with Annette, Fragoso told her that he could not believe what the men had done to her. Fragoso said he was afraid of retribution by the others if they learned he was talking to the police. He also told Foley that he was relieved to have told the police what happened and that he could now get a full night's sleep. Fragoso then ended the interview to "gather his courage" before he revealed everything he saw that night.

At the May 3 interview, Fragoso again related that he saw Jeff having intercourse with Annette. However, this time he said that Annette appeared willing and that she offered no resistance. One of the men then said to him, "It's your turn," so Fragoso approached Annette with his pants down, and a few of the men bent Annette over so she could perform oral sex on him.

On May 6, Fragoso gave Foley a written statement regarding the incident. In the statement, Fragoso admitted that his pants were down, but denied engaging in sexual intercourse or having oral sex with Annette. He acknowledged telling Foley on May 3 that he had oral sex with her, but stated that he was mistaken when he said that. Fragoso also acknowledged talking to Montoya, who warned him not to talk to the police.

Defendants first contend that the State failed to prove their guilt beyond a reasonable doubt. In *People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690, our supreme court abolished the sex-offense standard of review that had long been the law in Illinois, requiring a victim's testimony to be clear and convincing or substantially corroborated to prove guilt beyond a reasonable doubt. In place of what the *Schott* court determined was an overly burdensome standard, the reasonable doubt test was held to govern. Under that test, a sex-offense conviction, like any other, will be sustained if after viewing the evidence in the light most favorable to the prosecution, the reviewing court finds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Schott*, 145 Ill. 2d at 203, 582 N.E.2d at 697.) When presented with a challenge to the sufficiency of the evidence, we will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt as to the defendant's guilt. *Schott*, 145 Ill. 2d 188, 582 N.E.2d 690.

In a bench trial, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Riley* (1991), 219 Ill. App. 3d 482, 579 N.E.2d 1008.) So too it is the trial court's function to resolve conflicts in the evidence. On review, this court will not substitute its judgment for that of the trial court on these matters. *People v. Geneva* (1990), 196 Ill. App. 3d 1017, 554 N.E.2d 556.

■ Applying the foregoing principles to the present case, we conclude that the evidence was sufficient to find defendants guilty of both offenses beyond a reasonable doubt. Annette testified that there was no doubt in her mind that defendants were the ones who grabbed her arms and held her facedown on the couch while they and the others had sex with her. She further testified that her pants were pulled off and her vagina penetrated at least three separate times. In addition, the trial court heard Kowalski and Lesniak both testify that the day after the incident, Annette contacted them and complained that she had been "raped" at the party. Both reported that she was extremely upset when they spoke with her. This corroborative testimony, although not necessary for a finding of guilt, added to the credibility of Annette's testimony that she had been forced to have sex with defendants against her will. Moreover, Fragoso, who testified for defendants, admitted that during the drive home, Annette stated that in her mind she had been raped at the party, and that she wanted to get a gun and kill all of them. This testimony supported the State's case in that it showed that Annette was far

from calm and quiet on the drive home, as Fragoso told Foley at one point, but rather was upset and angry.

As to Annette's credibility, the trial court heard evidence that she consumed approximately 15 beers prior to the incident and that she had engaged in intercourse with Hermosillo on a prior occasion. Notwithstanding these factors, the trial court nevertheless determined that Annette's version of what occurred at the party was credible. The primary defense witness, Fragoso, gave at least three different versions of what occurred at the party, and in so doing his credibility was severely impeached. He wavered back and forth on the issue of whether Annette willingly had sex with defendants and the others, and with him as well, admitting, then denying, and again admitting that he engaged in oral sex and attempted to have intercourse with Annette. Fragoso stated in the May 1 interview with Foley that he drove Annette home after the incident in an attempt to calm her down because she was "very, very upset." Fragoso also told Foley he was relieved to have finally told the police what happened, and that he could now "get a full night's sleep." Fragoso admitted at trial telling Foley during that interview that he could not believe what those men had done to Annette, and that he was afraid of what defendants might do if they knew he had talked to the police about the incident. The trial court, weighing the in-court testimony of Fragoso and his various statements to police, could have concluded that Fragoso, in stating that Annette willingly consented to sex, was actually lying to protect himself and defendants.

Fragoso further admitted that he was contacted by Montoya after the incident, at which time Montoya told him that he had better not talk to the police about the incident, and if he talked to anyone it should be a lawyer. Fragoso also stated that Montoya wanted to meet with him to discuss the "matter" further. It was only after Fragoso spoke with Montoya that he changed his version of the incident, telling Foley that Annette, rather than being hysterical and desiring revenge against her attackers, instead appeared willing and offered no resistance to having sex with defendants and the others. This change further impeached Fragoso's trial testimony.

We also note that Montoya failed to report to the police that Annette consented to having sex with defendants at the party, even though he and defendants were friends and even after he learned they had been charged with multiple felonies. Moreover, Montoya's credibility was impeached at trial when he stated that during the incident he was in the bedroom watching a television program on Channel 11 whereas that channel did not broadcast during the time period in which the incident occurred.

Contrary to defendants' assertion, there is no requirement that Annette's testimony be corroborated by physical evidence in order to sustain their convictions for criminal sexual assault. (*Riley*, 219 Ill. App. 3d at 490, 579 N.E.2d at 1015; *Geneva*, 196 Ill. App. 3d at 1026, 554 N.E.2d at 562.) Nor must her testimony be corroborated by medical evidence. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) We hold that defendants were proved guilty of both crimes beyond a reasonable doubt.

■ Defendants also contend that the trial court erred in allowing Kowalski and Lesniak to testify that the day after the incident, Annette complained to them that she had been raped.

While as a general rule the testimony of a witness cannot be bolstered by other testimony showing that she made similar statements out of court, under the "prompt complaint" exception to the hearsay rule such testimony is admissible in a sex offense case as corroborative proof that the victim made a prompt complaint of the incident. *People v. Evans* (1988), 173 Ill. App. 3d 186, 527 N.E.2d 448.

While there is no fixed time limit within which the complaint should be made to qualify as "prompt," it must have been made without any inconsistent or unexplained delay, and it must have been spontaneous rather than the product of a series of questions. (*Evans*, 173 Ill. App. 3d at 199, 527 N.E.2d at 457.) Moreover, "since the sole purpose of the exception is to rebut any presumption which might arise from the complainant's silence, only the fact of the complaint is admissible; neither the details of the complaint nor the identity of the named perpetrator is admissible." *Evans*, 173 Ill. App. 3d at 199-200, 527 N.E.2d at 457.

■ Defendants argue that Annette's delay in complaining about the incident was unexplained, rendering the outcry testimony inadmissible. We do not agree. In the past, this court has admitted outcry testimony notwithstanding a delay in reporting the incident, where the victim was incoherent, fearful, hysterical, and/or emotional, and once finding a place or person lending her security, made the charge against her attacker. (See *People v. Williams* (1986), 146 Ill. App. 3d 767, 497 N.E.2d 377.) In our view, Annette's delay can be justified by her emotional state following the incident. Annette testified that she was upset, depressed and embarrassed about the incident, and went directly to her bedroom and cried, unable to sleep. Consequently, she did not immediately tell her mother what had occurred. Instead, she waited until after her mother left for work, and then telephoned Lesniak and Kowalski, two persons with whom she felt secure, and complained of the incident.

Kowalski was Annette's alcoholism sponsor. Similarly, Annette

met Lesniak, a nurse's aide, while a patient in the hospital where Lesniak worked, and through that experience developed a certain level of trust with Lesniak. In view of the relationships Annette had with Kowalski and Lesniak, it is understandable that she would choose them as the first persons to contact regarding her complaint. Less than a day passed between the incident and Annette's complaint. Accordingly, we reject defendants' contention that the testimony was inadmissible because of unexplained delay.

■ Defendants also argue that the testimony was inadmissible because Annette's complaint of the rape was not spontaneous, but was prompted by questioning on the part of both witnesses. We reject this contention as well. As to Annette's conversation with Kowalski, the record reveals that Annette, without any prompting, informed him that she had been "gang raped." Only then did Kowalski ask Annette what she was "talking about," to which she again responded that she had been raped. As to the conversation with Lesniak, we note that Lesniak, realizing Annette was upset, simply asked Annette "What happened?" and "What's wrong?" to which Annette responded that she had been raped. We do not find that these open-ended questions destroyed the spontaneity required under the hearsay exception. In similar cases, this court has held that responses to general, open-ended inquiries such as "What happened?" are admissible as prompt complaints. (*Evans*, 173 Ill. App. 3d at 201, 527 N.E.2d at 458; *People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132.) The key question is whether the statement would have been made had the question not been asked. (*Evans*, 173 Ill. App. 3d 186, 527 N.E.2d 448.) Under the circumstances here, we find the answer to be yes.

■ Defendants also assert that it was error to allow Kowalski and Lesniak to testify to anything other than the fact of Annette's complaint of the incident. We agree with defendants that the witnesses should have been so limited. However, neither witness testified to the identity of the offenders or to the specific details of the assault. They testified only that the incident occurred at a party and that there were a number of individuals involved. These details were minor and were in fact corroborated not only by Annette but by witnesses for the defense, who acknowledged that Annette engaged in sexual activity with several men, including defendants, at the party. Accordingly, any error in admitting the details was harmless. See, e.g., *Evans*, 173 Ill. App. 3d 186, 527 N.E.2d 448; *People v. Perkins* (1991), 216 Ill. App. 3d 389, 576 N.E.2d 355.

Defendants next complain that the trial court erred in refusing to admit evidence of Annette's consensual sex with a defense witness,

Adam Montoya, on the night in question. Defendants maintain that evidence of the fact that Annette had consensual sex with Montoya in a bedroom that night would have made it "more likely than not that she consented to sex in the living room a few minutes later."

■ We hold, however, that the testimony was properly excluded under this State's rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7), which precludes evidence of the victim's prior sexual activity with anyone other than the defendant. In *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726, our supreme court rejected the very reasoning which defendants ask this court to adopt here as justification for admitting evidence of Annette's consensual sex with Montoya.

As the court in *Sandoval* noted, the rape shield statute departed dramatically from the previous view of the courts, and represents the legislature's dismissal of the archaic assumption that an unchaste woman would more likely than not have consented to the sexual act at issue in a given case. The language of the statute is clear and unambiguous: "[T]he prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim *with the accused.*" (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 38, par. 115—7(a).) No exceptions to this rule are apparent in the statute.

In view of the fact that Montoya was not an accused in this case, we conclude that the trial court properly excluded his testimony regarding the alleged sexual encounter he had with Annette. That Annette may have consented to having sex with Montoya in the bedroom is irrelevant to whether she in fact consented to sex with defendants and the others in the living room an hour or two later. Moreover, we reject defendants' assertion that the sexual activity in the living room was merely an extension of what Montoya claims occurred in the bedroom such that the bedroom incident would not be considered "prior sexual activity" within the meaning of the statute.

Defendants next contend that they were not afforded effective assistance of counsel at trial because counsel failed to object to the outcry testimony and in fact elicited such testimony from a witness; failed to produce evidence of Annette's medical condition to corroborate their theory of consent; and failed to adequately cross-examine. Annette. Additionally, defendants contend that they were unduly prejudiced in being represented by the same attorney.

■ To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's conduct fell below an objective standard of reasonableness, and (2) there is a reasonable

probability that but for counsel's shortcomings the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) Counsel's performance must be evaluated on the basis of the entire record, and not upon isolated instances of alleged incompetence called into question by the defendants. *People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481.

■ In addressing an ineffective assistance claim, the reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendants as a result of the alleged deficiency. (*Albanese*, 104 Ill. 2d at 527, 473 N.E.2d at 1256.) If the court can dispose of the claim because defendants failed to establish actual prejudice, it will do so. *Albanese*, 104 Ill. 2d at 527, 473 N.E.2d at 1256.

■ We cannot conclude that defense counsel was ineffective because he failed to object to the outcry testimony of Kowalski and Lesniak on the basis that Annette's complaint was not spontaneous or that the testimony contained excessive detail. As we have previously stated, Annette's complaints of the incident were sufficiently spontaneous under the prior complaint exception. Moreover, although it was error for the witnesses to testify to more than the fact of Annette's complaint, as we have also stated, the details given were minor and were corroborated by the testimony of defendants' own witnesses.

■ Nor can we conclude that counsel was ineffective by introducing testimony from Fragoso which tended to corroborate Annette's testimony. Specifically, counsel asked Fragoso whether Annette told him on the way home from the party that she had been raped. Fragoso responded, "She mentioned something like that ***, [and] she said she wanted to get a gun and kill everybody." In our view, counsel's decision to elicit this testimony was a matter of trial strategy, as counsel was presumably aware of Foley's potential testimony regarding Fragoso's statement, that he told Annette in the car that "he could not believe what the men did to [her]." Fragoso in fact admitted telling Foley that he made this statement to Annette on the way home that night. It is altogether possible that counsel was attempting to reveal Annette and Fragoso's discussion of the seriousness of the incident before the State did. The fact that counsel may have employed this strategy does not render him ineffective. (*People v. Madej* (1985), 106 Ill. 2d 201, 478 N.E.2d 392.) Moreover, Fragoso's testimony added nothing that the trial court had not already heard from other witnesses. As such, it cannot be said that the outcome would have been different had the question not been asked.

Defendants also complain of counsel's failure to produce evidence of Annette's medical condition, arguing that it likely showed a lack of injuries since the State did not seek to have such evidence admitted in its case in chief.

■ Defendants have failed to indicate what medical evidence existed and what testimony would have been given to support their case. Defendants' assertion that evidence of Annette's medical condition would necessarily have assisted their case amounts to nothing more than speculation and conjecture, and does not support their claim of ineffective assistance. *People v. Ashford* (1988), 121 Ill. 2d 55, 520 N.E.2d 332.

Nor does counsel's failure to introduce evidence regarding Annette's former psychiatric hospitalization support such a claim. Once again, defendants fail to reveal what evidence, if any, pertaining to Annette's hospitalization would have assisted their case. Defendants' assertion that the evidence "may have helped the trial court to understand [Annette's] motivation in making a false complaint of rape" is nothing more than a hopeful hypothesis and is accordingly without merit.

■ Defendants also argue that trial counsel failed to adequately cross-examine Annette on the issues of lack of injury, the whereabouts of her "ripped" clothing, the effects of 15 beers on her perception, and the discrepancies in her testimony regarding how she got to the party. As with many of the other matters defendants have raised, the extent to which a witness is cross-examined is a question of trial strategy and is therefore beyond the scope of our appellate review. (*People v. Puente* (1984), 125 Ill. App. 3d 152, 465 N.E.2d 682.) Moreover, even had counsel cross-examined Annette as to these issues, we cannot conclude that there is a "reasonable probability" that the outcome of the trial would have been different.

As to Annette's perception on the night in question, even without focused cross-examination by counsel regarding the amount of alcohol she consumed, the record reveals that the trial court was keenly aware that Annette had consumed 15 beers and that such an amount could have affected her perception. However, based on the totality of the other evidence adduced at trial, it nevertheless concluded that Annette had not consented to having sex with defendants and the others in the living room.

As to the whereabouts of Annette's "ripped" pants, the record reveals that she clarified her characterization of the pants as being "pulled off," not "ripped off." Under these circumstances, we may presume that the state of Annette's clothing was not an issue, in the eyes of counsel, warranting cross-examination. Finally, counsel's fail-

ure to explore the question of how Annette got to the party is merely collateral to the primary question of consent, and in our view any discrepancies in this regard would not have affected the outcome of the trial.

Defendants finally contend that they were denied effective assistance of counsel by being represented by the same attorney. In Illinois, to prevail on a claim of ineffective assistance of counsel because of representation of codefendants by a single attorney, a defendant must show that an actual conflict of interest was shown at trial. *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.

■ Defendants claim that in an effort to impeach on Zamora's behalf, defense counsel introduced a prior sworn consistent statement in which Hermosillo was identified, creating an actual conflict of interest requiring reversal. We disagree. This one, isolated event at trial does not in our opinion translate into an actual conflict of interest of the sort justifying reversal. (See *Vriner*, 74 Ill. 2d 329, 385 N.E.2d 671.) This is particularly true because the statement, wherein Hermosillo was identified as being on the living room couch when the incident occurred, was irrelevant to defendants' theory that Annette consented to having sex with them. Through their own witnesses, both defendants admitted their involvement in the sexual activity. Thus, the fact that counsel caused a statement to be elicited in which Hermosillo was identified as participating in the incident does not provide a positive basis for concluding that an actual conflict of interest existed which denied defendants effective assistance of counsel. Indeed, the record reveals that counsel offered the statement to impeach Annette's ability to remember as well as her credibility in general, as part of his overall effort to provide defendants with effective representation.

Furthermore, the contention that separate counsel for Zamora may have rested after the State's case in chief, relying on the impeaching statement—in which Zamora was not identified as being present—rather than presenting numerous witnesses that he indeed had sex with Annette, is nothing more than speculation and is therefore without merit. *People v. Sanders* (1991), 209 Ill. App. 3d 366, 568 N.E.2d 200.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.