# Illinois Official Reports

## Appellate Court

---

### *People v. Kirklin*, 2015 IL App (1st) 131420

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AVERY KIRKLIN, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-1420 |
| Filed<br>Rehearing denied | March 6, 2015<br>April 14, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-11241(01); the Hon. Michele M. Simmons, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Samuel M. Hayman, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Katarina Durcova, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices McBride and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Avery Kirklin was found guilty after a bench trial of aggravated battery. This case involved a credibility dispute where the trial court resolved the credibility issue against defendant. Defendant, age 59, who had no prior criminal history and had been employed for over 30 years as a truck driver, was sentenced on April 18, 2013, to two years of probation. On this direct appeal, defendant claims that his trial counsel was ineffective for: (1) failing to impeach the victim with evidence of the victim's recent cocaine use; (2) failing to impeach the victim with prior inconsistent statements about the incident which the victim allegedly made to his friends; and (3) failing to call character witnesses who would testify to defendant's peaceful temperament.

¶ 2      For the following reasons, we affirm.

BACKGROUND

I. Pretrial Proceedings

¶ 5      On July 15, 2011, defendant, then age 57, and codefendant Samuel Spivey were indicted for aggravated battery by knowingly causing bodily harm to Carlos Motley on February 12, 2011, by striking Motley about the head with a bat. On October 7, 2011, the State provided a bill of particulars that stated the offense occurred on February 12, 2011, at 1:37 p.m., at 727 East 153rd Street, Phoenix, Illinois.

¶ 6      In defendant's discovery production, filed April 16, 2012, defense counsel listed six potential defense witnesses: (1) Pamela Herring, (2) "Herman Sarramala,"[1] (3) Mary King, (4) Laurence Hatter, (5) Duane Anderson, and (6) codefendant Samuel Spivey. On April 16, 2012, defense counsel informed the trial court that he had interviewed several of the witnesses.

¶ 7      On August 27, 2012, the case was set for a bench trial when the State moved for a continuance because one of its witnesses, Charlita Riley, had travelled out of state. The defense witnesses then present in court were: (1) Herman Seremela, (2) Mary King, (3) Laurence Hatter, and (4) "Mr. Cullum." The trial court instructed the witnesses to appear again on October 16, 2012, and continued their subpoenas.

¶ 8      On October 16, 2012, the trial was reset for November 19, and the court again instructed the witnesses to appear on the new trial date. The defense witnesses present in court were: (1) Herman Seremela; (2) Mary King; (3) Laurence Hatter; (4) Cynthia McCullen; and (5) Leonard Bynum. On November 19, 2012, the trial was reset for January 8, 2013.

II. The Trial

¶ 10      On January 8, 2013, defendant waived his right to a jury trial, and the bench trial commenced. The State called: (1) Officer Ricardo Frausto, the arresting officer; (2) Carlos Motley, the victim; (3) Charlita Riley, an event witness and the godchild of Judy Taylor; and (4) Judy Taylor, an event witness with whom the victim frequently stayed. The defense

---

[1] Defendant's April 16, 2012, discovery "Answer" spells this witness's name as "Herman Sarramala." However, in other places in the record, the last name is spelled as "Seremela," which we use later.

called: (1) Pamela Banks, a nurse who treated the victim after the incident; (2) Samuel Spivey, codefendant; (3) Officer Ricardo Frausto, the arresting officer, who was recalled by the defense; and (4) defendant. None of the six defense witnesses who were present in court on prior trial dates testified at the actual trial.

¶ 11 During opening argument, defense counsel stated that this case was an example of how no good deed goes unpunished. He argued that defendant was trying to break up a fight between Motley and codefendant Spivey, and that the only person who hit Motley was Spivey. Counsel told the court:

"[H]e didn't even attack[ ] the man. You will hear from other witnesses who have known them all in that community. They are actually–I interviewed countless witnesses. Everyone is shocked and appalled this man is sitting in the courtroom because he is not that type of person."

Despite counsel's representation in opening argument that the court would "hear from other witnesses who have known them all in that community" and that counsel had "interviewed countless" character witnesses, none appeared at trial.

¶ 12 In addition, during opening statement, counsel argued that the victim was a "[c]rack head":

"One thing you will know about [the victim is] that on the date he was hit with the baseball bat he had indulged himself in crack cocaine. You will also learn from him [that he] indulged in crack cocaine [for] at least five years that he admits to. That's who you are dealing with. [A] [c]rack head who basically stole [defendant's] phone."

However, the victim denied any cocaine use, and an issue on this appeal is counsel's attempt and failure to introduce a hospital report showing cocaine in the victim's system.

¶ 13                                      A. The State's Case
¶ 14                                   1. Officer Ricardo Frausto
¶ 15 The State's first witness, Officer Frausto, testified that he was currently employed as a police officer by the Calumet Park police department but that he had previously worked as a sergeant for the Phoenix police department, where he had been employed for 4½ years. On February 12, 2011, he and his partner, Officer Sahloul, responded in two different vehicles to a call of an aggravated battery occurring at 727 East 153rd Street, in Phoenix, Illinois. When he arrived at the residence, Carlos Motley and Charlita Riley were outside. Motley was holding his head, which was bleeding from his ear, and also grabbing his legs.

¶ 16 After speaking with Motley and Riley, Frausto dispatched information over the radio, and less than three minutes later, Sahloul pulled over a white vehicle traveling down 8th Avenue toward 153rd Street. Frausto proceeded to that location, which was two blocks away. Defendant was in the driver's seat of the white vehicle, and Samuel Spivey was in the right passenger seat. Frausto placed both men in custody. Frausto testified that, when Spivey exited the vehicle, Frausto observed "a white aluminum bat" on the floor of "the right passenger side."

¶ 17 After placing both defendant and Spivey into his patrol vehicle, Frausto drove back to 727 East 153rd Street and directed defendant to exit the vehicle. Both Motley and Riley then identified defendant. Motley stated: "That's him. That's him. He is the one that hit me." Riley stated: "Yes, that's him. That's the one that hit–that's the one that hit him." After

defendant returned to the patrol vehicle, Spivey exited, and both Motley and Riley identified Spivey. Frausto testified that "Motley also identified [Spivey] as the one that also hit him," and Riley "[a]lso identified Mr. Spivey as hitting Mr. Motley."

¶ 18      On cross, Frausto testified that defendant did not try to run after his vehicle was stopped, that defendant was totally cooperative, and that the bat was located on the front passenger side of the vehicle where Spivey was sitting.

¶ 19 <div align="center">2. Stipulation</div>

¶ 20      The parties read into the record a stipulation which stated that, if called to testify, Investigator[2] Paul Jimos would testify: that he was an investigator for the Phoenix police department on February 12, 2011; that he received an assignment to dispatch to the area of 153rd Street and 8th Avenue in Phoenix, Illinois; that he observed a white vehicle, that being a Beretta, parked on the south side of 153rd Street; that he recovered an aluminum bat from the vehicle; that he handled the bat with gloves and brought it to the Phoenix police department, where he inventoried it; that Exhibit 4A is the bag into which he placed the bat and Exhibit 4B is the bat itself; and that the bat is in the same or substantially same condition as when he last saw it.

¶ 21 <div align="center">3. Carlos Motley, Victim</div>
¶ 22 <div align="center">a. Direct Examination</div>

¶ 23      Carlos Motley, the victim, testified that on February 12, 2011, at approximately 1 p.m., he had an argument with defendant whom Motley knew as "Moochie." Motley had known defendant "[b]asically all my life." The argument occurred as Motley was walking toward "Miss Taylor's house," at 727 East 153rd Street, when Motley was only a few blocks from Taylor's house. Another man was present whom Motley could recognize, although Motley did not know the other man's name. Defendant told the other man, "there is the guy that stole my cell phone." Motley said nothing and "just kept walking." Motley, who was carrying a plastic shovel, arrived at Taylor's house and began shoveling the snow from the end of her driveway. As he was shoveling, he was facing toward her house.

¶ 24      Motley testified that, as he was shoveling, the "passenger that was with *** Moochie jumped out of the car and hit me in the leg with a baseball bat." Moochie stated: "I think his name is Samuel." Motley did not notice "Samuel" approaching until he hit Motley on the leg. They both then fell on the snow, and Motley dropped his shovel. Then, "Moochie grabbed the bat I believe and grabbed me and pulled me up and hit me up side of the head several times." As defendant was hitting Motley, Motley observed "Charlita" passing by; and Motley yelled "help," "Charlita," and "call the police"; and Charlita stopped. Then Judy Taylor exited her home, and defendant and "Samuel" entered their vehicle and drove off. Defendant entered the driver's side and the other man entered the passenger side.

¶ 25      Motley later learned that the other man's name was Samuel. After Motley dropped his shovel, he was unable to pick it up. After being hit in the head, Motley was covered with blood. Defendant drove off in a white Beretta, heading east on 153rd Street. When the police arrived, Motley pointed in the direction in which defendant had driven. The police later

---

[2] By the time that he testified at trial, he was a lieutenant.

<div align="center">- 4 -</div>

returned and asked Motley to identify defendant, and Motley stated that defendant was the "one that hit me in the head." Motley went to the hospital and received seven staples in his head. Also, his ear was cut and his left leg was swollen. Samuel hit Motley twice in the leg, and defendant hit Motley twice in the head, specifically by his left ear and the left back part of his head. After defendant hit Motley once, defendant held Motley by the collar and swung again.

<div align="center">b. Cross-Examination</div>

Since counsel's effectiveness in impeaching Motley, the victim, is an issue on appeal, we provide a detailed description of counsel's cross-examination of Motley.

On cross, Motley testified that he was treated at Oak Forest Hospital approximately an hour after he was injured and that hospital personnel asked him what happened and he told them. Counsel then asked: "Is it true, sir, when you were asked by hospital personnel you told them that three people assaulted you?" The State objected on the ground that "there is no way for counsel to proof up [*sic*]" because he did not have "someone under subpoena." Defense counsel replied that he had "a certified medical record," which was "[s]elf-authenticating." The following exchange then occurred:

"THE COURT: Counsel, you answered ready. Do you [have] a witness prepared to impeach?

DEFENSE COUNSEL: Judge, this is certified. Under court order that was sent to both parties.

THE COURT: I know what it is. Not admissible evidence. Not certified from the State or governing body. Medical records are not admissible. You know that. You need a witness. Do you have some one to perfect this?

DEFENSE COUNSEL: Not under subpoena.

THE COURT: Sustained."

Defense counsel next tried to ask the victim about his drug use, and the following exchange occurred:

"DEFENSE COUNSEL: At the hospital you were asked about prior drug usage? Is that correct?

ASSISTANT STATE'S ATTORNEY [ASA]: Objection.

DEFENSE COUNSEL: Goes to the–

THE COURT: Overruled.

DEFNSE COUNSEL: Isn't it true, sir, when you were asked by hospital personnel you admitted to using crack cocaine?

ASA: Objection.

THE COURT: Sustained. Counsel, unless you are going down a road to impeach–

DEFENSE COUNSEL: I would ask enter and continue to bring the witness.

THE COURT: Denied. The witness is on the witness stand. Proceed.

DEFENSE COUNSEL: We are trying to get to the truth. That's what the courtroom is about. Trying to get to the truth.

THE COURT: *** [Y]ou know as well as I do how to try a case. If you are attempting to impeach a witness you need to perfect your impeachment.

DEFENSE COUNSEL: It depends on his answer whether or not impeachment is necessary. He has not answered the question. He has to be allowed to answer the question.

THE COURT: I'll allow it.

DEFENSE COUNSEL: Isn't it true you told the hospital at Oak Forest that you were using crack cocaine for five years? Is that correct?

MOTLEY: No.

DEFENSE COUNSEL: Isn't it true you had crack cocaine in your system when [they] drew blood from you?

ASA: Objection.

THE COURT: One second.

MOTLEY: No.

THE COURT: Last question[,] objection sustained. With regards to the next question [about] crack cocaine[,] let me hear the question.

DEFENSE COUNSEL: Sir, on February 11, 2011[,[3]] you used crack cocaine prior to the incident?

ASA: Objection.

MOTLEY: No.

THE COURT: Objection overruled.

ASA: Relevance.

THE COURT: Has he used crack cocaine on this date?

DEFENSE COUNSEL: That's correct.

THE COURT: You may answer.

MOTELY: No.

DEFENSE COUNSEL: So you are telling this Judge [there was] no crack cocaine in your system [on] February 11, 2011?

ASA: Objection.

THE COURT: That's a different question. What–objection is going to be sustained. That's a different question."

¶ 30    Motley agreed that his first encounter with defendant and Spivey was four blocks away from Judy Taylor's house. Motley walked to her house and did not observe them again until he was at her house. Motley did observe them drive away. Counsel asked: "[W]hen you were interviewed by Sergeant Frausto on February 11, 2011[,[4]] at the scene[,] isn't it fair to say you never told them about this alleged argument that took place four blocks earlier." Motley replied: "I don't remember." When asked whether he told Investigator Jimos about the alleged argument, Motley replied: "They didn't ask." When asked again whether he told "them," Motley again replied: "I don't remember that."

¶ 31    Next counsel asked Motley about his relationship with Judy Taylor:

[3]Defense counsel asked about February 11, 2011, which was the day before the offense.
[4]Defense counsel asked about February 11, although the offense occurred on February 12.

"DEFENSE COUNSEL: You told them [you were] shoveling snow in front of Judy Taylor's [house]? Is that correct?

MOTLEY: Yes.

DEFENSE COUNSEL: In fact, you lived with Judy Taylor; didn't you?

MOTLEY: Not really.

DEFENSE COUNSEL: What does not really mean, sir?

MOTLEY: I had not officially moved with her.

DEFENSE COUNSEL: In fact, she was your girlfriend?

MOTLEY: No."

¶ 32    Motley testified that, when he and Spivey fell to the ground, Spivey let go of the bat and the bat was on the ground. Then Motley agreed that, when a police officer arrived, the officer asked what happened and Motley told him. Then the following exchange occurred:

"DEFENSE COUNSEL: You told this Judge the bat fell to the ground? Right? Right?

MOTLEY: I don't remember.

DEFENSE COUNSEL: Well, isn't it true you told Officer Frausto on the scene that Spivey handed [the] bat to [defendant] after he whacked you on the leg? Isn't that true?

MOTLEY: No."

¶ 33    Next, Motley was questioned about defendant's actions during the altercation:

"DEFENSE COUNSEL: You [t]old the Judge that [defendant] picked you up with his hands and [was] whacking you with the bat. You remember telling the Judge that?

MOTLEY: Yeah.

DEFENSE COUNSEL: Which hand did he allegedly pick you up with?

MOTLEY: With his left. Grabbed me like this.

DEFENSE COUNSEL: And, what were you wearing at the time?

MOTLEY: I don't remember. A coat.

***

DEFENSE COUNSEL: He grabbed you with his left hand and he had the bat with his right hand?

MOTLEY: Yeah.

DEFENSE COUNSEL: Is that true?

MOTLEY: Yeah."

Motley testified that defendant pulled Motley up from the snow and hit Motley's head twice.

¶ 34    Motley did not know whether he had told Sergeant Frausto that defendant had pulled him up from the snow or that Spivey had knocked him down to the ground. Motley also did not remember telling the ASA, whom he met after he was released from the hospital, that defendant picked him up off the ground. Defendant never hit Motley while Motley was on the ground. Defendant never had a pipe or shovel in his hands.

¶ 35    Motley testified that he had known Laurence Hatter for over 30 years. However, he denied having a conversation with Hatter about this incident during the summer of 2011.

Motley stated that he spoke to Hatter "[a]ll the time," but he never spoke to Hatter about this incident. Defense counsel then asked "isn't it true" that, during a conversation at Gibson's gas station on 152nd Place and Halsted Avenue, Motley told Hatter that defendant never hit Motley in the head. When the ASA objected, defense counsel replied that he was "laying a foundation for impeachment." The court asked, "This witness is here?" and defense counsel replied "yes." The court then overruled the State's objection, and Motley denied telling Hatter that.

¶ 36    On cross, Motley testified that he also knew Bernard Bynum because they all "hang [at] the same yard they fix cars at," but that Motley "barely" spoke to Bynum and that he "never talked to Bernard about this case." Defense counsel asked if Motley knew Mike Fuller and a man named Calvin, and Motley stated that he knew Mike Fuller and that he "kn[e]w a lot of Calvins." Counsel's alleged failure to subsequently call Hatter, Bynum, Fuller and "Calvin" in the defense case is an issue on appeal.

¶ 37    Concerning his connection to Judy Taylor, Motley testified:

> "DEFENSE COUNSEL: Judy Taylor, you said you sometimes live with her? ***
> MOTLEY: I didn't say that.
> DEFENSE COUNSEL: What did you say?
> MOTLEY: I said at times incidents happen. I was not staying with her. Fully. So that means that sometimes [I] spent the night over there. That doesn't mean we had a relationship. We don't. She is like a sister to me."

Motley and Taylor discussed the case several times and rode to court together. "[B]asically" all they said during the ride is that they would be glad when the case was over.

¶ 38    Motley testified that he had known Charlita Riley, the State's next witness, "[s]ince she was a baby," but that they never discussed the case.

¶ 39                          4. Charlita Riley
¶ 40                        a. Direct Examination
¶ 41    Charlita Riley, 36 years old, testified that on February 12, 2011, at approximately 1:30 p.m., she was driving east on 153rd Street in the town of Phoenix, when her attention was caught by someone hollering in the 700 block of 153rd Street, where Judy Taylor lives. Riley recognized the voice as belonging to the victim, Carlos Motley, who was yelling "help Charlita." When Riley looked toward the voice, she observed Motley being hit in the head with a bat by defendant, whom she knew as "Moochie" and whom she had known "a long time." Riley then made a U-turn in the middle of 153rd Street and 4th Avenue, and pulled in front of Judy Taylor's house, in back of a white Beretta. After Riley exited her vehicle, she observed that Motley was bleeding and she called 911. As Riley walked from her vehicle toward the men, Motley walked toward the porch and defendant told another man who was with him: "Let's go man." Riley had not observed the other man prior to that day. Defendant and the other man then entered their vehicle and drove away. As the two men entered the vehicle, Riley observed the bat in defendant's hand. Motley was bleeding from his ear and from the top of his head. Judy Taylor exited her home but Riley did not recall exactly when that occurred. The police arrived 10 minutes later and Riley told them what she had observed, but she did not recall how many officers arrived. The police departed and returned soon afterwards with defendant, and Riley identified defendant as the person who "[h]it

- 8 -

Carlos in the head with a bat."

¶ 42                                    b. Cross-Examination

¶ 43    Since trial counsel's effectiveness is an issue on this appeal, we provide below a detailed description of counsel's cross-examination which led the trial court, as fact finder, to conclude that Riley was "not the most credible witness."

¶ 44    On cross, Riley testified that her driver's side window was half-way down because it was warm outside, even though it was February. She did not recall whether there was snow on the ground. Defendant had both of his hands on the bat and he hit Motley twice "sideways on his head," but she did not recall whether the other man also hit Motley. She never observed a shovel in defendant's hand. After the incident, a Phoenix police officer asked her what happened and she told him. Defense counsel then asked her the following questions:

> "DEFENSE COUNSEL: Isn't it true you told Officer Frausto you saw [defendant] and [an] unknown black male hitting Motley while on the ground repeatedly? Isn't it true that's what you told the officer?
>
> RILEY: No, it is not.
>
> DEFENSE COUNSEL: Okay. And, isn't it also true you told that same officer that you saw the unknown male black holding the guy back?
>
> RILEY: No.
>
> DEFENSE COUNSEL: Isn't it true you also told the officer that [defendant] was holding what looked like a shovel with a wooden handle? Isn't it true you told the officer that?
>
> RILEY: No, I did not."

¶ 45    On cross, Riley testified that, although she did not live in Phoenix on February 11, 2011, her grandmother, aunt and brother lived there. At first, Riley denied that Motley lived at Judy Taylor's house, although she admitted that he did a lot of handyman work there and "spen[t] nights over there." Then the following exchange occurred between her and defense counsel:

> "DEFENSE COUNSEL: On June 29, 2011[,] you have a handwritten statement to a Cook County State's Attorney Jessie McGuire as well as Cook County Investigator Joseph Thomas? Is that correct? June 29, 2011? Is that correct?
>
> RILEY: Yes, he do a lot.
>
> ***
>
> DEFENSE COUNSEL: All right. And, isn't it true, Ma'am, in your statement where you signed every page you stated Carlos Motley lived with Judy Taylor?
>
> RILEY: Yes, I did say that.
>
> DEFENSE COUNSEL: But, that was a lie? Right?
>
> RILEY: He spends nights there."

¶ 46    On cross, Riley testified that Judy Taylor was her godmother. Riley denied discussing the case with Taylor but stated that she had discussed it with Motley twice.

¶ 47    On cross, defense counsel asked Riley whether she recognized her prior signed statement to police and at first she said no. Then the court asked her and she changed her answer stating: "Yes, I recognize the document. I signed it." Counsel then confronted her with the portion of her statement in which she stated that she looked out her driver's side window and

observed a man, not defendant, hitting Motley with a bat, and she then made a U-turn. However, in court, Riley testified: "It never was the man. It was always Moochie." Riley admitted that the statement contained what she stated in June 2011; however, she stated it was not correct:

> "DEFENSE COUNSEL: That's what you said back in June of 2011? Is that correct?
>
> RILEY: Yes.
>
> DEFENSE COUNSEL: 'Cause that's what you saw? Right?
>
> RILEY: I seen Moochie.
>
> DEFENSE COUNSEL: My question[:] that's what you saw on February 11, 2011? The other man beating him with the bat? Correct? Correct?
>
> RILEY: No. That's not correct.
>
> DEFENSE COUNSEL: You didn't see that. So you're lying on this piece of paper? Are you lying on this paper?
>
> RILEY: No, I'm not. I seen Moochie."

¶ 48　　On cross, Riley was questioned about her prior testimony that defendant had swung "sideways" at Motley:

> "DEFENSE COUNSEL: Well, isn't it true, Ma'am, in your statement in June of 2011 you stated when Moochie hit Carlos [Motley] he held a bat over his head and swung down? ***
>
> RILEY: I don't remember.
>
> ***
>
> DEFENSE COUNSEL: Read that for the Court when–
>
> ***
>
> RILEY: When Moochie hit Carlos he held the bat over his head and swung down.
>
> DEFENSE COUNSEL: You never said sideways in your statement; did you?
>
> RILEY: I'm–I don't remember.
>
> ***
>
> DEFENSE COUNSEL: Swinging sideways is no where in your statement; is it?
>
> RILEY: No, it is not."

¶ 49　　Next on cross, Riley was questioned about her prior testimony that defendant had both his hands on the bat, which contradicted Motley's testimony that defendant pulled Motley up from the snow with his left hand and swung the bat at Motley with his right hand:

> "DEFENSE COUNSEL: So when [defendant] held the bat with both hands as you told the judge earlier[,] did he ever drop one of the hands and grab Carlos *** pulling him towards him? Did he do that?
>
> RILEY: I don't remember.
>
> DEFENSE COUNSEL: Did you ever see [defendant] hold–grab a hold of Carlos with both hands? Did you see that?
>
> RILEY: So much going on I don't remember. I don't remember.
>
> ***

DEFENSE COUNSEL: You never told that officer that you ever saw [defendant] grab a hold of– *** You never [t]old that officer that; did you?

RILEY: No I did not.

***

DEFENSE COUNSEL: You–let's go back to the June 29, 2011[, interview] [w]here you were here in this building and spoke to a prosecutor and investigator. In that statement to them, you never [t]old them and you never included in your statement that you ever saw [defendant], the person you call Moochie, put his hands or grab[ ] a hold of Carlos Motley; did you[?]

RILEY: No, I did not.

DEFENSE COUNSEL: 'Cause you never saw him do that; did you?

RILEY: No. I did not see [defendant] grab [Motley].

DEFENSE COUNSEL: You never saw [defendant] grab a hold of Carlos and pick him up off the ground and then start beating him with a bat? You never saw that; did you?

RILEY: No, I didn't."

¶ 50    After Riley's testimony, a discussion was held off the record, and the trial was then continued until February 7, 2014. Defense counsel asked on the record for the trial court to continue the writ[5] for codefendant Spivey until February 7, which the court did. Defense counsel did not ask on the record to continue witness subpoenas, but the record does not disclose whether this was handled during the off-the-record discussion.

¶ 51                            5. Judy Taylor, Riley's Godmother
¶ 52                                a. Direct Examination

¶ 53    The State's case resumed a month later on February 7, 2013, with the testimony of 61-year-old Judy Taylor, with whom the victim frequently stayed and who was the godmother of Riley, a prior witness.

¶ 54    Taylor testified that she lived at 727 East 153rd Street in Phoenix, Illinois, and was currently retired after having worked as an "IT specialist" for Blue Cross Blue Shield for 40 years. She had lived her whole life in the town of Phoenix, and on February 12, 2011, at 1:30 p.m., she was at home with her grandson. She was ill and upstairs in her bedroom, and she did not pay attention at first when her grandson related that he heard arguing. However, when he said it again, she lowered the volume on the television and heard a commotion, so she went downstairs and opened the door. She observed Carlos Motley, whom she had known for over 40 years, kneeling on the ground and holding his head. Motley was in her driveway, about 30 feet from her door, and "blood was everywhere."

¶ 55    Taylor also observed defendant, whom she knew as "Moochie," and another man, whom she did not know beforehand. Taylor had known defendant for over 40 years, and he "had a pipe or something to that manner" in his hand and was "standing over" Motley. The object that defendant held was white and about two feet long. Defendant was "just standing there

_____

[5]Although the record does not disclose whether Spivey was in custody after pleading guilty in this case, the court and counsel stated "writ," not "subpoena."

with it in his hand," while the other man had nothing in his hands. Taylor told defendant "Moochie[,] I'm gonna call 911" and she did. After she informed defendant that she was going to call 911, defendant and the other man "fled," driving away in a white Beretta. Explaining her use of the word "fled," Taylor testified: "[T]hey walked fast, quickly; they didn't run, they walked." Defendant took the white object with him when the two men left.

¶ 56    Taylor testified that the white Beretta traveled east on 153rd Street, with defendant in the driver's seat and the other man in the passenger seat. After Motley stated he did not want to enter the house, Taylor brought out towels because Motley was "bleeding profusely," and Motley held his head with the towels until the ambulance arrived. When Taylor was shown the bat in People's Exhibit 4B, she admitted that it was red and beige.[6]

¶ 57                                            b. Cross-Examination

¶ 58    On cross, Taylor testified that she had the flu but she had not taken cold medication. Taylor admitted that, in addition to being red and beige, the bat was also black. The police arrived in five minutes or less, and she spoke with the officer who arrived at the scene. In addition, "a couple months" or "a few weeks" later, she went several times to the Phoenix police station. At that time, she said that the object in defendant's hands was white. The officer did not show her the bat, and she never identified the bat as the object which she observed in defendant's hands. She told the officers that defendant had a pipe in his hand, similar to that used in plumbing.

¶ 59    On cross, Taylor testified that, as she walked downstairs, she could still hear arguing outside. Taylor admitted that she never observed anyone strike Motley and she never observed the bat which was Exhibit 4B:

"DEFENSE COUNSEL: At no point while you were looking, did you ever see [defendant] strike Carlos Motley, did you?

TAYLOR: I did not.

DEFENSE COUNSEL: And at no point did you ever see this other young man[,] or whoever the other man was, strike Carlos Motley, did you?

TAYLOR: No, I did not.

DEFENSE COUNSEL: And at no point did you ever see a bat, other than this pipe you're talking about, you never saw that bat in [defendant's] hands, did you?

TAYLOR: I saw a white pipe.

DEFENSE COUNSEL: That's not my question. You never saw that bat in his hand, did you?

TAYLOR: No.

THE COURT: For you record, you're pointing at People's [Exhibit] 4B.

DEFENSE COUNSEL: That is correct.

***

DEFENSE COUNSEL: My question is this; People's [Exhibit] 4B, you never saw that out there that whole time you looked, did you?

TAYLOR: No.

_____

[6]Officer Frausto had testified that the bat was white and aluminum.

DEFENSE COUNSEL: In fact, you never saw a shovel outside either, did you?

TAYLOR: I don't recall seeing a shovel."

After Taylor's testimony, the State moved its exhibits into evidence and rested. The defense then moved for a directed finding, which was denied.

### B. The Defense Case

### 1. Pamela Banks, Triage Nurse

The defense's first witness was Pamela Banks, a registered nurse for 33 years. On February 12, 2011, she was working in the emergency room of Oak Forest Hospital as a triage nurse. Banks explained that "triage" is the initial assessment of a patient conducted when the patient first enters the emergency room. She conducted the triage for Carlos Motley, who entered the hospital with a head injury. As part of the triage, she interviewed Motley and asked him questions concerning his past medical history, including drug use. During this conversation, Motley informed Banks that he had a five-year history of cocaine use.

On cross, the parties stipulated that Banks had written in her triage assessment form that Motley was oriented and alert.

At the conclusion of the trial, during the trial court's recitation of the evidence, the trial court stated: "On cross examination, [Banks] stated she was never given a date of crack cocaine usage with a time frame." On cross, Banks explained how she ascertained the dates of a patient's medical problem: instead of asking for a specific year she inquired when the problem began:

"BANKS: I asked him–not a specific date, I asked him how long–if an answer is yes, I will follow that with, for example, if I say do you have any medical history, and if he says asthma, I'll say when did it first start or something of that nature. I don't ask him an actual date, he'll say probably when I was five, and then I'll subtract five from his present age."

Below we provide the questions related to the trial court's conclusion:

"ASA: Now when you asked Mr. Motley about substance abuse history, he gave you no year period of time, isn't that true?

BANKS: I'm sorry, would you repeat the question?

ASA: *** When you asked Mr. Motley about his substance abuse history, he gave you no period of time, no year period of time?

DEFENSE COUNSEL: Objection; vague.

THE COURT: Objection is overruled. Do you understand the question?

BANKS: I don't ***.

ASA: He didn't tell you when this alleged use of crack began, isn't that true?

BANKS: If I wrote it down there, he–he meant–he told me when it began.

***

ASA: *** [D]id Mr. Motley, Carlos Motley give you a date?

BANKS: He gave me a time frame.

ASA: My question was did he give you a date.

BANKS: No, ma'am.

ASA: As so you never asked him when this alleged crack use began, correct?

BANKS: Did I ask him when the crack use began[?] I asked him approximately when did the drug use began, yes, ma'am.

\*\*\*

ASA: It's not in your report, isn't that true?

BANKS: It's in my report for five years."

Banks did not ask Motley whether he was under the influence of crack cocaine while at the hospital on February 12, 2011, and he did not inform her whether he was.

¶ 67    On redirect, defense counsel tried to ask Banks about the victim's lab report, and his failure to introduce the lab report is an issue on appeal:

"DEFENSE COUNSEL: Isn't it true he did, in fact, was sent to have a lab done and he tested positive for cocaine?

ASA: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: [The ASA] asked about the report, we gon' [*sic*] talk about the whole report.

THE COURT: Sustained. She asked about the triage report, objection is sustained.

DEFENSE COUNSEL: She did not say triage the first time, Judge, you can have the court reporter read it back, she said the report.

THE COURT: Sustained [as] to any lab report."

¶ 68                                    2. Samuel Spivey, Codefendant

¶ 69    The defense's next witness was Samuel Spivey, codefendant. Spivey testified that he was 51 years old and that he was a friend of defendant, whom he had known for 25 or 30 years. On the afternoon of February 12, 2011, Spivey and defendant left Spivey's house in Harvey, Illinois, to drive to Spivey's sister's house in Phoenix, so that Spivey could receive money from defendant's sister for work they had done fixing her plumbing. Defendant was in the driver's seat, and Spivey was in the front passenger seat. While they were in the vehicle, defendant remarked "that's Carlos," referring to a person walking on the street, and defendant pulled the vehicle over. Spivey told Motley to tell the truth, which was a reference to defendant's cell phone, and Motley replied: "[M]ind yo' business bitch ass old man." Spivey responded that he "wasn't gon' be na're 'nother bitch," and exited the vehicle. Motley was standing on the passenger side of the vehicle and hit Spivey with a shovel. Spivey testified:

"I went to step toward Mr. Carlos, tell him I'm not gonna be non' his bitch old man, and he swung and hit me with a shovel. He went to hit me across my head, but he missed and hit me 'cross my shoulder."

¶ 70    After Motley hit him, Spivey returned to the vehicle to retrieve a pipe wrench but he observed a bat in the backseat of defendant's vehicle under some clothes and he grabbed that instead. He then hit Motley in the head with the bat. During this time, defendant was standing between Motley and Spivey, trying to break it up and saying "don't do this." After Spivey hit

- 14 -

Motley with the bat, defendant pushed them apart. Then defendant and Spivey entered defendant's vehicle and drove back to Spivey's house in Harvey. They returned to Phoenix, so that Spivey could obtain money from defendant's sister for fixing the pipes in her house.

¶ 71 Spivey testified that the sole reason why he hit Motley with the bat was because Motley had hit him with the shovel. When asked if there was any other reason, Spivey replied: "No, that's it. He hit me with the shovel, I hit him with the bat, self defense." Spivey pled guilty, but he did not say to precisely what. Spivey exited defendant's vehicle because "he called me a bitch ass old man." Defendant never told Spivey to hit Motley; defendant never had possession of the bat; and Spivey never observed a woman make a U-turn and park behind defendant's vehicle or a woman exit the house.[7]

¶ 72 On cross, Spivey testified that he was convicted for hitting Motley in the head with the bat which he identified in People's Exhibit 4. Spivey exited defendant's vehicle because Motley "disrespected" him. When Spivey and defendant drove away, "Carlos [Motley] was standing on the side of the curb," and Spivey "didn't see no blood at all." After his arrest, he told the police that Motley had hit him with a shovel and he showed the officers where the shovel had bruised his shoulder. At the time of the incident, defendant and Spivey owned a landscaping business together.

¶ 73 On redirect, Spivey testified that he had called defendant's phone "all night long," and the next day someone called him at 6 a.m. asking who this was. Spivey then asked where defendant was. The voice he heard on the phone was not the same voice that he heard when he later encountered Motley.

¶ 74 At the conclusion of the trial, when the trial court reviewed the evidence, it did not find Spivey's testimony credible, stating: "Some of Mr. Spivey's testimony, I do not believe. I do not believe Samuel Spivey's testimony. I do not believe he struck Mr. Motley in the head with this and [defendant] had nothing to do with it. I do not believe that."

¶ 75 After Spivey's testimony, defense counsel sought a continuance because Officer Frausto was not available. Counsel informed the court that he had only two more witnesses. One was Frausto; and defendant also later testified. Thus, apparently on February 7, 2013, counsel did not intend to call character witnesses or other impeachment witnesses. The trial was continued to March 13, 2014.

¶ 76 <center>3. Officer Frausto</center>

¶ 77 On March 13, 2013, Officer Frausto[8] was recalled as an impeachment witness by defense counsel. Frausto testified that, on February 12, 2012, he responded to a call concerning a man with a head injury and he traveled to 737 East 153rd Street in Phoenix. There he interviewed Charlita Riley at 1:45 p.m. and she informed him that she had observed everything, that she had observed an unknown black male hitting Motley repeatedly while Motley was on the ground, that this unknown male held a white bat, and that defendant held a shovel with a

---

[7]Taylor testified that she was in the doorway when defendant and Spivey were there, but she did not exit the house at that time.

[8]When Officer Frausto first testified on January 8, 2013, he spelled his name for the record and the transcript states it was spelled "F-R-A-U-S-T-O." However, on March 13, 2013, he was again asked to spell his name and the transcript states it was spelled "F-r-a-u-s-t-o-s." For the sake of consistency, we have spelled his name as "Frausto" when describing both dates of testimony.

- 15 -

wooden handle. Riley never told Frausto that she observed defendant holding a bat or hitting Motley.

¶ 78    Frausto testified that he interviewed Motley the same day, almost contemporaneous to his interview with Riley. Motley did not tell Frausto that he had an argument four blocks away from the incident. Motley stated that the unknown black male handed the white bat to defendant and that defendant and the unknown black male took turns hitting him while he was on the ground.

¶ 79                                                    4. Defendant

¶ 80    Defendant testified that he was currently employed as a truck driver with Sheply Trucking Company, where he had worked for seven years. He had worked as a truck driver for 33 years, while also doing construction jobs on the side, such as working on sidewalks, patios and driveways. During the morning of February 12, 2011, he was at a "family property" in Phoenix fixing the plumbing, when he realized he needed help, so he drove in his white 1995 Chevy Beretta to Samuel Spivey's house. From there, defendant and Spivey drove to the True Value Hardware on Chicago Road in Dolton, Illinois. Then they returned to the first building and finished fixing the plumbing. Then they drove to defendant's sister's house so his sister could pay Spivey. After they left his sister's house, defendant observed Carlos Motley shoveling snow in front of Judy Taylor's house in Phoenix. Defendant pulled to the curb facing east, so that the passenger side of his vehicle was closer to Motley than the driver's side. Defendant told Motley that defendant "had been at Sprint the day before for 4 hours," and that Motley "won't get [defendant's] phone no more because [Motley] won't never get back in [defendant's] car again." Then Spivey told Motley: "Man, why don't you just tell the man that you smoked the phone up–sold [the] phone and smoked it up."

¶ 81    Defendant testified that Motley said to Spivey: "F you, B A old man." Then counsel asked defendant to state exactly what Motley had said, and defendant stated: "I am not used to this. So he said, fuck you, bitch ass, old man–just like that." Spivey exited the vehicle and approached Motley. Defendant then exited on the driver's side and walked around in order "to stop Carlos [Motley], because I know he has a bad attitude." Defendant observed Motley but not Spivey, and defendant stated to Motley: "Well, Carlos, you were the one in the car. You're the only one that could have got the phone." Then, three to five seconds later, Spivey hit Motley in the head with the bat. Defendant did not observe Spivey until he hit Motley. Defendant was standing 2½ to 3 feet from Motley and directly in front of him, when Spivey came from behind defendant. Defendant then stood in between them and "broke it up." Defendant "told Sammy to get back in the car," and "Carlos to get out of here."

¶ 82    Then defendant and Spivey drove to Spivey's house to drop off Spivey's tools, and they returned to Phoenix because defendant wanted to check on Motley. When defendant drove up to Taylor's house again, Motley was on the porch with a towel on his head. However, Motley was "at an outrage" so defendant drove away and that is when the police stopped him. The police then returned defendant to Taylor's house. Defendant testified that he never told Spivey to attack Motley; that he never hit Motley with a bat, shovel or pipe; and that he never hit Motley at any point.

¶ 83    On cross, defendant testified that he believed that Motley stole his phone and that he was at the Sprint store because his phone was missing. All defendant wanted was to tell Motley that he was not happy about his missing phone and that Motley was not entering his vehicle

- 16 -

again. At that time, Spivey did not know Motley. There was a bat in defendant's vehicle on February 12, 2011, but defendant did not know if Exhibit 4B was that particular bat or not. A bat had been in his vehicle for approximately three weeks, and it belonged to Spivey. Defendant had done "a clean out job" after a "lady's husband" died and "he was over the baseball team." Spivey and defendant always worked together, and Spivey placed the bat in defendant's vehicle.

¶ 84 On cross, when asked why he "did not pick up the phone" after the altercation, defendant replied: "I didn't have a phone." Defendant and Spivey arrived back at Taylor's house approximately 35 to 40 minutes after Spivey struck Motley in the head; however, defendant does not recall the time. Defendant did not observe an officer at the house when he arrived back, and defendant was not present when an ambulance arrived. Motley was sitting on the step, and defendant did not approach him. Defendant also did not observe either Judy Taylor or Charlita Riley at the moment when he arrived back.

¶ 85 On redirect, defendant testified that he was stopped by the police just two minutes after he left Taylor's house the second time. After defendant testified, the defense rested.

¶ 86 At the close of evidence, when the trial court made its factual findings, the court stated that it found "unbelievable" defendant's testimony that he did not observe Spivey retrieve the bat from defendant's vehicle. The court found:

"THE COURT: *** [The bat] is in his car. But he says he doesn't see Mr. Spivey get this weapon. He doesn't see him come around him.

He just sees Mr. Spivey all of a sudden strike Mr. Motley over the head with this baseball bat. The Court does not believe that. I don't believe he did not see this."

¶ 87 **C. The State's Rebuttal Case**

¶ 88 After the defense rested, the State called Lieutenant Paul Jimos, about whom the parties had previously entered a stipulation. Jimos testified that he had been a member of the Phoenix police force for over three years. On February 12, 2011, he was not a lieutenant but an officer assigned to an investigation. On February 13, 2011, at 2:30 p.m. Jimos interviewed Spivey at the police station. Jimos asked Spivey to remove his shirt, and Jimos looked at Spivey's right shoulder, right upper arm, right lower arm, left shoulder, left upper arm and left lower arm, and Jimos did not observe any injuries. Spivey stated that he had been struck by a shovel, but he did not complain of any injuries.

¶ 89 On cross, Jimos stated that Spivey told him that Spivey had been struck in the shoulder with a shovel. On redirect, Jimos testified that he did not observe any bruises, cuts or nicks on Spivey. The State then rested in its rebuttal case.

¶ 90 **D. Defense Exhibits; Failure to Impeach**

¶ 91 After the State rested, the court acknowledged that defendant had two exhibits, a report and a handwritten statement, but it did not state that these exhibits were admitted.

¶ 92 The State then moved to strike certain testimony of the victim, Carlos Motley, where defense counsel had asked him about conversations with various individuals, such as Laurence Hatter and Bernard Bynum, who did not testify. Defense counsel stated that he was not arguing the motion because:

"DEFENSE COUNSEL: It's not evidence. Because [Motley] denied everything. So I did not perfect an impeachment. So therefore, it's not evidence. There is no need to strike."

¶ 93    The trial court then stated that, since this was a bench trial, it knew "what is admissible and what is not," and "what has been perfected and what has not been perfected," and the parties proceeded to closing argument.

¶ 94                     III. Argument, Conviction and Sentencing

¶ 95    During closing argument, defense counsel stated: "He has all of these people in the courtroom supporting him." The State objected to the statement, and the trial court sustained the objection.

¶ 96    After argument, the trial court, as the fact finder, reviewed the evidence and made factual findings. The trial court stated that it did not believe either defendant or Spivey, that Riley "was not the most credible witness"; and that "Judy Taylor was the most credible witness to this Court." The court found:

> "Ms. Taylor who had no interest in any of this, who just happened to look out the window and saw what occurred. There was no impeachment, certainly of any significance on M[s]. Taylor.
>
> She sees [defendant]. What she can't see is a bat, but a white object right over Mr. Motley. And this is Mr. Motley bleeding from the head. And Mr. Motley tells the Court that it was [defendant] who struck him.
>
> Based on that testimony, the Court makes the following finding: With regard to Count I, aggravated battery, causing bodily harm to Carlos Motley while using a deadly weapon, [without] discharge of a firearm, alleging he struck Carlos Motley about [the] head with a bat ***. There is a finding of guilty entered on Count I."

¶ 97    The probation report indicated that defendant had no prior criminal convictions and had worked as a truck driver for over 30 years. Defendant was sentenced on April 18, 2013, to two years of probation, with a scheduled termination date of April 17, 2015. At sentencing, defense counsel informed the court that he had spoken with "all of those witnesses," without identifying them by name or stating whether they were impeachment or character witnesses. Counsel stated that he "didn't think some of them could withstand cross examination based on their limited education" and that he had "talked to over 15 people in that community."

¶ 98    On April 18, 2013, defense counsel also filed a motion for reconsideration or for a new trial on the grounds that the State had failed to prove defendant guilty beyond a reasonable doubt and that the trial court erred in giving too much weight to the testimony of Judy Taylor when she did not witness the event.

¶ 99    Included with the motion were letters, all from April 2013, from eight individuals including: (1) Duane Anderson, a former employer, who was listed as a potential witness in defendant's answer to the State's request for discovery; (2) Mary King, who was listed as a potential witness and who appeared in court on both August 27, 2012, and October 16, 2012; and (3) Herman Seremela, who was listed as a potential witness and who appeared on both August 27 and October 16. The trial court denied defendant's motion for a new trial or reconsideration.

¶ 100     A timely notice of appeal was filed, and this appeal followed.

¶ 101                              ANALYSIS

¶ 102     Defendant claims that defense counsel was ineffective for: (1) failing to impeach the victim with evidence of the victim's recent cocaine use; (2) failing to impeach the victim with prior inconsistent statements about the incident which he allegedly made to his friends; and (3) failing to call character witnesses who would testify to defendant's peaceful temperament.

¶ 103                         I. Standard of Review

¶ 104     Since defense counsel obviously did not argue his own ineffectiveness to the trial court, the trial court never made a ruling on the question which we must address now: whether he was ineffective. Where there is no ruling below for us to review, our legal consideration is made on a blank slate or *de novo*. *Wagner v. Eagle Food Centers, Inc*., 398 Ill. App. 3d 354, 358 (2010) (a court does not proceed on a blank slate where there is a prior order); *People v. Wilson*, 392 Ill. App. 3d 189, 197 (2009) (appellate court reviewed ineffectiveness claim *de novo* where there was no trial court ruling to review). *De novo* consideration means that we perform the same analysis as the trial judge would have performed. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 105                        II. Ineffective Assistance

¶ 106     Defendant's claims on appeal all concern his counsel's alleged ineffective assistance.

¶ 107     Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois state constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must show both: (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 108     To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 109     Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a trial

court may dismiss the claim if either prong is missing. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *People v. Albanese*, 104 Ill. 2d 504, 527 (1984).

¶ 110                              III. Failure to Introduce Lab Report

¶ 111    Defendant argues, first, that counsel was ineffective on cross-examination because he tried and failed to introduce a lab report showing that Motley had cocaine in his system on the day of the incident, and because counsel later called the wrong hospital witness during the defense case in an attempt to prove up the impeachment of the victim's denial of cocaine use on the day of the incident.

¶ 112    However, defense counsel did call a nurse who testified that the victim admitted to her that he had used crack cocaine for five years, although the trial court misrecalled the impeachment.

¶ 113    Defendant argues that the lab report of recent cocaine use would have undermined Motley's account of what he perceived that day.

¶ 114    Defendant's argument overlooks the fact that a claim of ineffectiveness must be evaluated based on the entire record, and defense counsel did a thorough job of exposing the weaknesses and contradictions in the State's case through cross-examination. *People v. Dobrino*, 227 Ill. App. 3d 920, 934 (1992) ("Counsel's performance must be evaluated based on the entire record and not on isolated instances of alleged incompetence called into question by defendant." (citing *People v. Flores*, 128 Ill. 2d 66, 107 (1989))). Motley, the victim, claimed on cross that the 57-year-old defendant pulled Motley up and off the ground with just one hand and swung the bat at Motley's head one-handed. Motley claimed that defendant never hit Motley while Motley was on the ground.

¶ 115    By contrast, Riley testified on cross that defendant had both his hands on the bat and that she never observed defendant grab Motley and lift him off the ground. Riley, who is the godchild of Judy Taylor with whom Motley frequently stays, testified that she observed only defendant hitting Motley. However, she acknowledged on cross that, in June 2011, she told the police that she had observed a man, who was not defendant, hitting Motley with a bat. Riley also testified that defendant swung "sideways" with the bat at Motley's head. However, she admitted that swinging sideways does not appear in her prior statement, and she read into the record the portion of her prior signed statement in which she stated that "[w]hen Moochie hit Carlos he held the bat over his head and swung down."

¶ 116    Defense counsel did such an effective job of cross-examining Riley that the trial court found that "she was not the most credible witness." Concerning counsel's effective impeachment of Riley, the trial court observed: "There were things she was impeached on that she should not have been. So the Court does have some suspicions with regard to what she saw and what [she] did not see." The court further found that defense counsel "perfected" his impeachment of Riley by recalling Officer Frausto to testify about Riley's prior statement of what she "saw and did not see."

¶ 117    While an attorney should know how to introduce a medical record into evidence at trial, it is not reasonably probable that this one omission would have changed the result at trial where the trial judge, as the fact finder, relied primarily on the testimony of another event witness,

namely, Judy Taylor, and relied on Motley's testimony principally for the limited fact that defendant, whom Motley had known his whole life, was the one swinging the bat at him. *Domagala*, 2013 IL 113688, ¶ 36 (the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (citing *Strickland*, 466 U.S. at 694)).

¶ 118    Defendant argues that the "report would have undermined Motley's account of what he perceived on that day," namely, whether it was Spivey who was hitting him on the head with a bat and not defendant. Even if defense counsel had successfully introduced the lab report showing recent cocaine use,[9] it is not reasonably probable that this evidence would have changed the outcome at trial, in light of the fact that the nurse at the hospital testified that, even after receiving a head injury, Motley was still alert, oriented and able to provide a rational and responsive answer to her question about drug use.

¶ 119    Thus, we do not find persuasive defendant's claim that his attorney's failure to introduce evidence of recent cocaine use had a reasonable probability of changing the outcome at trial.

¶ 120                    IV. Failure to Call Impeaching Witnesses

¶ 121    Defendant's second claim is that defense counsel failed to call witnesses to perfect his impeachment of the victim.

¶ 122    First, during cross, counsel asked Motley whether he had talked to either Laurence Hatter or Bernard Bynum about this case and defendant denied it. Counsel also asked Motley whether he knew Mike Fuller or a man named Calvin, and Motley stated that he knew Mike Fuller and "a lot of Calvins." Defendant claims that counsel was ineffective for failing to call these friends of the victim in order to impeach him.

¶ 123    Second, counsel asked Motley: "Is it true, sir, when you were asked by hospital personnel you told them that three people assaulted you?" However, the court sustained the objection to this question because counsel failed to perfect the impeachment by failing to subpoena hospital personnel who could substantiate this prior inconsistent statement.

¶ 124                            A. Victim's Friends

¶ 125    Defendant claims that counsel should have called four of the victim's friends to testify about the victim's conversations with them about the incident: (1) Laurence Hatter; (2) Bernard Bynum; (3) Mike Fuller; and (4) "Calvin." Defendant's only support for the fact that there were prior conversations is counsel's questions about them. However, with respect to Mike Fuller and Calvin, counsel asked only if the victim knew them; he did not ask about prior conversations. Thus, there is no support in the record that there were prior inconsistent statements by the victim to Fuller and Calvin.

¶ 126    With respect to Laurence Hatter and Bernard Bynum, the record establishes that counsel did subpoena them to testify and they appeared in court on scheduled trial dates. Both Hatter and Bynum acknowledged in open court on October 16, 2012, in response to specific questions by the judge, that they had been subpoenaed by defense counsel to testify at trial. In response to the subpoena, Hatter appeared in court on both August 27, 2012, and October

---

[9]As noted, defense counsel did introduce evidence of Motley's five-year cocaine use which lent support to Spivey's comment that Motley had "smoked the phone up."

16, 2012, which were dates scheduled for trial, as well as on January 8, 2013, the first day of trial. Bynum appeared in court on October 16.

¶ 127    The record does not disclose why Hatter and Bynum did not testify at trial: whether defense counsel failed to continue their subpoenas for the presentation of the defense case on February 7 and March 13, 2013; whether counsel made a strategic decision not to call them after further investigation; whether they simply tired of appearing without being called; or whether there is some another explanation. *Dobrino*, 227 Ill. App. 3d at 934 ("a matter of defense strategy will not support a claim of ineffective representation" (citing *People v. Madej*, 106 Ill. 2d 201, 214 (1985))). The State argues that the record on appeal was not developed for the purpose of answering this question and that this question would be better resolved at a collateral proceeding. We agree. This court has repeatedly held that, when the basis of defendant's ineffectiveness claim relies on matters not of record, the claim is better brought in a collateral proceeding. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 3; *People v. Brown*, 2014 IL App (1st) 122549, ¶ 41 (when a claim relies on matters outside of the record, it may not be brought on direct appeal and the rule of forfeiture is relaxed in a collateral proceeding). A collateral proceeding is generally a better forum for adjudication of ineffective assistance claims. *People v. Flores*, 231 Ill. App. 3d 813, 827-28 (1992) (without an explanation from trial counsel, a reviewing court cannot determine whether counsel's omissions involved the exercise of judgment, discretion or trial tactics).

¶ 128                                B. Statement to Hospital Personnel

¶ 129    Defendant also claims that counsel was ineffective for failing to subpoena hospital personnel who could have substantiated an allegedly prior inconsistent statement made to them by Motley that three people had assaulted him. The State argues that the record is insufficient for answering this question and thus would be better resolved at a collateral proceeding.

¶ 130    First, there is no evidence of this statement in the record on direct appeal, other than counsel's question which Motley denied. Second, the record does not disclose the name of the person to whom this statement was allegedly made. If the statement had been made to Pamela Banks, the triage nurse, then counsel may have made a strategic decision not to inquire further about it, in light of the fact that it contradicts the testimony of every event witness, both State and defense. *Dobrino*, 227 Ill. App. 3d at 934 ("a matter of defense strategy will not support a claim of ineffective representation" (citing *Madej*, 106 Ill. 2d at 214)). As we observed before, matters not supported by the trial record are not appropriately raised on direct appeal. *Brown*, 2014 IL App (1st) 122549, ¶ 41 (when a claim relies on matters outside of the record, it may not be brought on direct appeal).

¶ 131                                V. Failure to Call Character Witnesses

¶ 132    Defendant's third claim is that defense counsel failed to call witnesses, as promised during his opening, who would testify concerning defendant's peaceful nature and impeccable reputation in the community. *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009) (counsel may be deemed ineffective if he promises a particular witness during his opening statement but does not provide the promised testimony (citing *People v. Ligon*, 365 Ill. App. 3d 109, 119-20 (2006))); but see *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80

- 22 -

(counsel's "decision not to provide promised testimony may be warranted by unexpected events").

¶ 133    In the case at bar, the trial judge found that Charlita Riley was impeached and that Judy Taylor never observed defendant strike the victim. Thus, the trial was a credibility dispute between the victim on one hand, and defendant and Spivey on the other, as to whether Spivey alone struck the victim or whether defendant struck him as well. On appeal, defendant claims that there is a reasonable probability that the testimony of character witnesses would have tipped this credibility dispute in his favor.

¶ 134    The record indicates that defense counsel did, in fact, investigate and subpoena numerous witnesses who appeared in the courtroom on scheduled trial dates. First, the record contains defendant's April 16, 2012, answer to the State's motion for discovery, which listed six potential defense witnesses, only one of whom actually testified. Second, on August 27, 2012, when the case was originally set for trial, four defense witnesses appeared in court. We know that defense counsel had served each one of them with a subpoena because the court asked, "You were all subpoenaed by [defense counsel] today?" and each one replied "[y]es." The trial court then continued the subpoenas and instructed the witnesses to appear again on October 16, 2012, the new trial date. However, none of these four witnesses testified at the actual trial.

¶ 135    Third, on October 16, 2012, three of the defense witnesses who had appeared on the prior date were again present in court, as well as two additional witnesses. After the trial date was again continued, defense counsel informed the judge that his "subpoenaed witnesses" were here, and the judge replied that she had "figured as much" because she had heard "all" of them "blowing in the back of [her] courtroom" after the date was continued. The court then directed the witnesses to approach the bench and state their names, and then she inquired whether "[a]ll of you were subpoenaed by [defense counsel] for the case of [defendant]" and they all replied affirmatively. The court then continued the subpoenas and instructed the witnesses to appear again on November 19, which the court stated would be "the final continuance date." However, on November 19, the trial was again continued to January 8, 2013. Defense counsel informed the court that, since the State had notified him of a problem, he had "called off [his] witnesses." As a result, the trial court did not instruct the defense witnesses in open court about the actual trial date.

¶ 136    Fourth, although the defense witnesses were not instructed in open court about the actual trial date, we know that at least one of them was in court then. On January 8, 2013, defense counsel was trying to impeach Motley with prior statements that he had made to Laurence Hatter, and the court inquired whether "[t]his witness is here" and defense counsel replied "yes."

¶ 137    However, a month later, on February 7, 2013, when the defense case began, and again on March 13, 2013, when the defense case continued, Hatter was not called as a witness, nor were any of the other witnesses who had appeared on prior court dates. The record before us does not disclose the reasons for their absence. We do not know whether defense counsel failed to continue their subpoenas for the dates of the defense case, whether he decided not to call them after further investigation, or whether there is some other explanation. While an attorney may force a witness to appear on repeated dates through the use of a subpoena, a peeved witness may not make the best character witness. The State argues that we lack a sufficient record on direct appeal, and we agree.

- 23 -

¶ 138    "A defense counsel's failure to provide testimony promised during opening statements is not ineffective assistance of counsel *per se*." *Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Although a defense "counsel's assistance may be ineffective if he or she promises" during opening that "a particular witness will testify" and the witness is not called at trial, "we have also recognized that counsel's decision to abandon a trial strategy during trial may be reasonable under the circumstances and that the decision not to provide promised testimony may be warranted by unexpected events." *Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Since the record on appeal was not developed to establish either the reasons of the trial attorney or the motives of the witnesses, this issue cannot be resolved on direct appeal. *Brown*, 2014 IL App (1st) 122549, ¶ 41 (when a claim relies on matters outside of the record, it may not be brought on direct appeal); *Flores*, 231 Ill. App. 3d at 827-28 (without an explanation from trial counsel, a reviewing court cannot determine whether counsel's omissions involved the exercise of judgment, discretion or trial tactics).

¶ 139                                    CONCLUSION
¶ 140    For the foregoing reasons, we are not persuaded by defendant's claim on this appeal that his trial counsel was ineffective, and we affirm his conviction and sentence.

¶ 141    Affirmed.